LOCAL 644, UNITED BROTHERHOOD OF CARPENTERS AND JOINERS OF AMERICA, AFL–CIO, Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD.

No. 73–1144.

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 30, 1974.

Decided Dec. 30, 1975.

Rehearing Denied Feb. 10, 1976.

Bernard M. Mamet, Chicago, Ill., for petitioner.

Robert G. Sewell, Atty., N.L.R.B., with whom John S. Irving, Deputy Gen. Counsel, Patrick Hardin, Associate Gen. Counsel, and Elliott Moore, Acting Asst. Gen. Counsel, N.L.R.B., were on the brief for respondent. Marcel Mallet-Prevost, Asst. Gen. Counsel, N.L.R.B., also entered an appearance for respondent.

William A. Ziegler, Jr., New York City, was on the brief for intervenor Babcock and Wilcox Co.

Arthur B. Smith, Jr., entered an appearance for intervenor, Morrison Constr. Co.

Before LEVENTHAL, MacKINNON and WILKEY, Circuit Judges.

Opinion for the court filed by Circuit Judge MacKINNON.

Dissenting opinion filed by Circuit Judge LEVENTHAL.

MacKINNON, Circuit Judge:

Upholding the decision of its Administrative Law Judge (ALJ),[*] the National Labor Relations Board ruled that Local 644 of the United Brotherhood of Carpenters and Joiners of America had violated section 8(b)(4)(ii)(B) of the National Labor Relations Act[1] by engaging in a strike designed, through threatening, coercing and restraining certain general contractors, to force them to cease doing business with a subcontractor (Kinnear) because he had not signed an agreement with Local 644.[2] The Union appeals this decision, insisting that it sought only to enforce a legitimate work preservation clause against a primary employer. The Board has cross-applied for enforcement of its order, and Morrison Construction Company and Babcock & Wilcox Company, charging parties before the Board, have intervened in these proceedings. Because we agree with the Board that the Union's acts indicated alternative objectives, not only to preserve traditional work but also to unionize employees outside the unit, we affirm.

I.

In 1970 the Commonwealth Edison Company initiated construction of a multimillion dollar power plant near Pekin, Illinois. Walsh Construction Company was designated general contractor in charge of erection of the plant's superstructure; Babcock &

---

[*] The title of "Trial Examiner" was changed to "Administrative Law Judge" effective August 19, 1972.

1. Section 8(b)(4)(B), 29 U.S.C. § 158(b)(4)(B) (1970), provides:

(b) It shall be an unfair labor practice for a labor organization or its agents—

* * * * * *

(4)(i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is—

* * * * * *

(B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person, or forcing or requiring any other employer to recognize or bargain with a labor organization as the representative of his employees unless such labor organization has been certified as the representative of such employees under the provisions of section 159 of this title: *Provided,* That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing[.]

2. The Board's decision is reported at 200 N.L. R.B. 1056 (1972).

Wilcox Company, Morrison Construction Company, and Eichleay Corporation were also general contractors on the project, respectively responsible for the installation of a steam generator, major piping, and a turbine generator. Each of these contractors employed carpenters and millwrights represented by Local 644, the affiliate of the United Brotherhood of Carpenters and Joiners of America with territorial jurisdiction in Tazewell and Mason Counties, Illinois. Functioning as bargaining representative for all Carpenter Union employees in these counties, Local 644 had negotiated a collective bargaining agreement with the Home Builders Association of Tazewell County, a multiemployer group consisting of all employers "throughout the entire jurisdiction of the union."[3] Walsh was not a member of the Tazewell County Association and had not signed an agreement directly with Local 644. However, there was a contract between Walsh and the Carpenters'

International Union in which Walsh had agreed to recognize the jurisdictional claims of the International and its affiliates for on site work[4] and to abide by the wages, hours and working conditions established or agreed upon by any subordinate of the International in any locality where work of the company is being done. Significantly, the contract with the International also required that Walsh would not subcontract jobsite work within the International's jurisdiction except to a subcontractor who either held an agreement with the International or one of its affiliates, or who had agreed in writing to be bound by the terms of such an agreement.[5]

▪ Walsh let a subcontract to Kinnear Corporation for fabrication off site and erection on site of seven roll-up steel doors. Kinnear arrived at the project on September 20, 1971, prepared to erect scaffolding and to install the doors and power mecha-

---

3. Appendix 25.

4. 200 N.L.R.B. at 1058. Walsh was thus required to abide by the terms of the collective bargaining agreement between the Home Builders Association and Local 644. Section 7 of that document provided:

SECTION 7. *SUB-CONTRACTING.* The parties hereto being in the Construction Industry qualify under the provision of SECTION 8(e) of the National Labor Relations Act of 1947 as amended. The EMPLOYER shall not contract or sub-contract any work coming within the jurisdictional claims of the UNION to any person, firm or corporation not covered by a collective bargaining agreement with the UNION, providing however, that the provisions of this paragraph shall apply only to the contracting and sub-contracting of work to be done at the site of construction, alteration, painting or repair of a building, structure or other work, and

The EMPLOYER will not sub-contract any work within the jurisdiction of the United Brotherhood of Carpenters and Joiners of America which is to be performed at the job site except to a contractor who holds an agreement with the United Brotherhood of Carpenters and Joiners of America or one of its sub-ordinate bodies, or who agrees in writing, prior to or at the time of the execution of his sub-contract, to be bound by the terms of this agreement.

These restrictions parallel those contained in the contract between Walsh and the International, recited at note 5 *infra*.

5. Walsh's contract with the International provided in part:

AGREEMENT between Walsh Construction Company herein referred to as the Company, and the United Brotherhood of Carpenters and Joiners of America.

The Company agrees to recognize the jurisdictional claims of the United Brotherhood of Carpenters and Joiners of America, to work the hours, pay the wages and fringe benefits, and observe the lawful working conditions (including lawful union shop agreements) established or agreed upon by the United Brotherhood of Carpenters and Joiners of America and the recognized agency of the locality in which any work of the Company is being done, with respect to journeymen carpenters employed by the Company.

No change is to be made in the hours, wages and other conditions established or agreed upon in any locality.

The Company will not subcontract any work within the jurisdiction of the United Brotherhood of Carpenters and Joiners of America which is to be performed at the job site except to a contractor who holds an agreement with the United Brotherhood of Carpenters and Joiners of America or one of its subordinate bodies, or who agrees in writing, prior to or at the time of the execution of his subcontract, to be bound by the terms of this Agreement.

\* \* \* \* \* \*

Dated: November 29, 1968.

nisms. A Union job steward noted Kinnear's arrival and promptly voiced to Walsh's superintendent his suspicion that Kinnear intended to install the power mechanisms and, with respect to one of the doors, to erect scaffolding over 14 feet high—two tasks allegedly reserved by the Union agreements to carpenters.[6] On five different occasions between September 20 and November 8, representatives of Walsh, Kinnear, the Carpenters' International and Local 644 met in various groups to discuss the assignment of this disputed work, and at almost every turn Walsh's superintendent assured the Union representatives that the tasks could be performed by carpenters, that "there would be no problem."[7]

A sixth meeting was arranged for the afternoon of November 9, but that meeting dissolved when the business agent for the Ironworkers, who represented Kinnear's employees, made an unscheduled appearance and issued an intractable demand that Kinnear be allowed to perform all tasks associated with installation of the steel doors. Within a half an hour all members of Local 644, those who worked for Walsh and those employed by the other general contractors on the project, walked off the job site. That evening the business agent for Local 644 sent Walsh a telegram demanding arbitration of the no-subcontracting provision of the contract which obtained between those two parties. By the time Walsh received the message the following day—to which he responded that the "dispute had been referred to the Joint Board" —Local 644 had set up a picket line under

placards bearing the legend "Walsh . . Only," and thus ensued the two-week strike which was the basis of the Board's section 8(b)(4)(ii)(B) ruling. Despite the "Walsh . . . Only" placard, all the other general contractors were struck in addition to Walsh.

The strike was both orderly and successful. Picketing took place at "the entry point for all the construction employees," and though operating employees of Commonwealth Edison gained access to the site through a separate gate, "none of the carpenters employed by Walsh *or the other contractors* reported for work, and many employees of other crafts also refused to cross the picket line for varying periods of time."[8] Striking employees did not attempt to solicit support for their effort at the picketed gate.[9]

The strike concluded on November 24, and the International Unions of the Carpenters and the Ironworkers moved to settle their conflicting jurisdictional claims. They specified in a joint letter dated December 3 that scaffolding over 14 feet should be assigned to carpenters, but no clear resolution emerged from discussion concerning installation of the power mechanisms. The Carpenters' International representative contended that the Ironworkers' International had conceded the installation task to carpenters, but Walsh harbored doubts about this concession, insisting it could not change Kinnear's work assignments without Kinnear's permission. Apparently to solve this impasse, Kinnear ulti-

---

**6.** The ALJ found that "[t]he erection of the doors themselves and of scaffolding 14 feet or less in height [was] concededly the work of Local 112, International Association of Bridge, Structural and Ornamental Ironworkers, AFL–CIO (the Ironworkers), under its agreement with Kinnear." 200 N.L.R.B. at 1057. He noted that "[o]nly 1 of the 7 doors required scaffolding over 14 feet," *id.* at 1058 n. 2; his *opinion did not attempt to resolve the dispute* between the carpenters and the ironworkers over that scaffolding or the installation of power mechanisms. The Union's Exhibits Nos. 2 and 3, the agreements between the Ironworkers' and Carpenters' International Unions dated June 11, 1959, and September 27, 1961, respectively, appear to concede to carpenters both the

"installation of self-supporting scaffolds over fourteen feet in height" and the installation of "the power activating mechanism" for "heavy steel roll curtain type doors" App. 18–19. But the legitimacy of the Union's claim to these disputed tasks does not affect our decision concerning the legality of its strike to enforce the subcontracting restrictions in its collective bargaining agreement.

**7.** 200 N.L.R.B. at 1059. *See also* Petitioner's Brief·at 7–9.

**8.** 200 N.L.R.B. at 1059–60.

**9.** *Id.* at 1060; App. 92.

mately consented to the assignment of Walsh carpenters to the power mechanism installation.[10]

Acting on charges filed by Walsh, by the three other general contractors on the project, and by Lord Electric Company (electrical subcontractor for Babcock & Wilcox), the Board's General Counsel issued a complaint charging Local 644 with violations of sections 8(b)(4)(i) and (ii)(B) because of the Union's picketing and work stoppage. Following a hearing, the ALJ filed a 16 page decision which included Findings of Fact, Contentions of the Parties, Concluding Findings, Conclusions of Law, and an Order. These point out, *inter alia,* that the Union contended its strike had "no secondary objective" but rather was part of an attempt to preserve its traditional or "fairly claimable" work and hence had a valid primary motivation; and that the charging parties contended that the Union's work stoppage and picketing violated sections 8(b)(4)(i) and (ii)(B) because, even if preservation of carpenters' traditional work was one objective of the work stoppage, another object was enforcement of the contractual restrictions against subcontracting by illegal secondary methods.

 In his Concluding Findings, the ALJ stated the criterion by which he would resolve these conflicting claims as follows:

The rule or principle to be applied in determining whether a provision in an agreement between a contractor and a union has a primary objective outside the scope of Section 8(e), or a secondary objective within the scope of that Section, has been variously phrased, but depends essentially on whether the "Union's objective was preservation of work for [unit] employees, or whether the agreements . . . were tactically calculated to satisfy union objectives elsewhere . . . . . The touchstone is whether the

agreement or its maintenance is addressed to the labor relations of the contracting employer *vis-a-vis* his own employees."[5] If an object of the provision is to aid union members generally rather than members of the unit, the object is secondary and unlawful.[6]

[5] *National Woodwork Manufacturing Association v. N. L. R. B.,* 386 U.S. 612, 644–645 [87 S.Ct. 1250, 18 L.Ed.2d 357]. See also, *Orange Belt District Council of Painters No. 48 v. N. L. R. B.* [117 U.S.App.D.C. 233], 328 F.2d 534, 538 (C.A.D.C.).

[6] *Meat and Highway Drivers, Local 710, Teamsters v. N. L. R. B.* [118 U.S.App.D.C. 287], 335 F.2d 709, 716 (C.A.D.C.).

(Supp.App.14). He then analyzed the application of *National Woodwork, supra,* to the instant case, distinguished some of its facts, and—because the Union representatives had constantly referred to such provisions as indicating the objectives of their demands—he considered the subcontracting provisions of the agreement between Walsh and the International which only referred to an agreement with Local 644 as one possible alternative (note 5 *supra*):

An absolute prohibition of subcontracting is primary in scope, and its violation may be enforced by strike action.

However, a provision which permits an employer to subcontract out on-site construction work only to a subcontractor who will himself agree to be bound by the agreement between the contractor and the union, is an organizational device directed against the subcontractor, designed to preclude a signatory contractor from doing business with a non-signatory subcontractor. The purpose of such a provision is not to protect the work of employees already in the bargaining unit, but to enlarge the coverage of the bargaining unit by forcing the subcontractor to accept his contractor's agreement with the Union, thereby affecting his relationship with his own employees who must

---

10. At page 5 of its Reply Brief, the Union argues that any "arrangement Walsh may or may not have made with Kinnear on the side has certainly no bearing upon the instant case . . . ." We agree: an accord between Walsh and Kinnear made necessary by the Union's work stoppage and picketing cannot be

taken as evidence that Walsh had the power to settle the dispute by reassigning contested work to Local 644, or as evidence that the Union's attempt to force Kinnear to become a signatory to its collective bargaining agreement was permissible under the Act.

join a union not of their own choosing, and with potential employees who would have to use the Union's hiring hall.[11]

The ALJ opinion had also earlier cited additional acts of the Union representatives which, contrary to the allegation made by the dissent, were properly interpreted and relied upon as indicating their secondary objectives[12]: those representatives, the ALJ stated,

> reminded [Walsh's representative] of the subcontracting clause in the Carpenters [International] agreement with Walsh (Supp.App.10) . . . asked the Kinnear superintendent if his company had a contract with the Carpenters [International] (Supp.App.10) . . . stated that Walsh had an agreement with the Carpenters [International], that the work in dispute was bargaining unit work, and that [the Project Manager of Walsh] would be in violation of the subcontracting provision of the agreement if Kinnear did the work . . . (Supp.App.11), [and 644's representatives] were concerned whether Kinnear, the subcontractor, had a bargaining agreement with *the Carpenters International or some constituent body of that organization.* They were demanding in effect that the Carpenters' jurisdictional claims be observed by Kinnear, and that the work in dispute be assigned to Kinnear employees whom Local 644 would represent.

(Supp.App.15) (emphasis added). This critical finding of fact in the ALJ's opinion is also supported by testimony of the Union business agent (Guler) who, after making several ambiguous statements and finally being confronted with an earlier affidavit, testified:

> Q. Will you look at page 2 of your affidavit that you have in front of you, General Counsels for identification 10, please? Does that not say at the top of the page, "I told him it would be a violation of the agreement to subcontract that to somebody who didn't have an agreement with the Carpenters Union"? A. Yes, that's true.
>
> Q. That is what you said, is it not, at that meeting on September 21st, 1971? A. Yes.
>
> Q. And that was the point you wanted to make, was it not? A. Anything in this statement is true.

(App. 113).

\* \* \* \* \* \*

> Q. (By Mr. Ziegler) Is it correct, Mr. Guler, you would have been satisfied if Kinnear had done the work using members of the Carpenters Union? A. Using member of the Carpenters Union?
>
> Q. Yes. A. We had no signed agreement. There was no signed agreement with Kinnear.
>
> Q. But if Kinnear had signed one and used members of the Carpenters Union, you would have been satisfied, wouldn't you? A. If this is what they would have wanted.
>
> Q. If that's what they wanted to do, that would have been all right with you? A. That would have been okay.
>
> Q. Because carpenters would have been doing the work? A. Right.

(App. 111). This testimony, indicating that the objectives of Local 644 were not confined to the claims of its own unit but would have been satisfied if *any* union carpenter did the work, is buttressed by the facts that Local 644 had no direct contract with Walsh and none whatsoever with Kinnear; that the provision Local 644 sought to enforce in the first instance was embodied in a contract between Walsh and the Carpenters' International Union; and that a representative of the International was active in the strike negotiations. All these

---

11. 200 N.L.R.B. at 1061.

12. The dissent fails to recognize that the opinion of the ALJ is just like our opinions in that the facts alluded to therein were found and relied upon whether they were recited in the "concluding findings" or in the ALJ's statement of background facts. Factual findings are not required to be stated two or more times in an opinion to retain their character, and can be relied upon by a reviewing court to dispose of later arguments that go well beyond the arguments raised at the administrative level.

facts are found and recited in the opinion of the ALJ, and indicate that Local 644 was not enforcing its own contract but rather was attempting to force Kinnear to abide by a contract between Walsh and the International. These facts are all relevant to the strike objective of Local 644 and they support the finding that an object of the union was to benefit the International rather than itself.[13]

The opinion of the ALJ concluded that on the facts of this controversy, "an object of Local 644 was to cause Walsh . . . to change its method of doing business with Kinnear, the subcontractor, with whom Local 644 had a primary dispute over the assignment of work."[14] The strike thus violated section 8(b)(4)(i) of the Act by inducing employees of the complaining parties to cease work in furtherance of a prohibited object, and section 8(b)(4)(ii)(B) by restraining Walsh in furtherance of the same object.

The Board adopted the ALJ's findings and conclusions and amended them only to include additional section 8(b)(4)(ii)(B) violations stemming from restraint and coercion of Babcock & Wilcox, Morrison, Eichleay, and Lord.[15] The Board incorporated by reference the ALJ's proposed remedy, the issuance of an order that Local 644 cease and desist from the specified unfair labor practices[16] and that it take certain affirmative action to rectify the consequences of its unlawful strike, notably the posting of notices affirming the Union's intent not to engage in the proscribed inducement and coercion in the future. Local

---

**13.** All of this evidence was before the ALJ, and it is proper to assume that it was considered by him and formed the basis for his finding of a secondary objective. So long as the ALJ has made findings of basic facts, detailed summaries of testimony are not required. K. Davis, Administrative Law Treatise § 16.06 (1958). The ALJ has provided a detailed finding of basic facts here, see generally Supp.App. 6–16, and has clearly confronted "the facts on which appellant relies and the legal inferences those facts suggest." Wingo v. Washington, 129 U.S. App.D.C. 410, 413, 395 F.2d 633, 636 (1968). No greater specificity is required; the findings presented are more than adequate to allow judicial review, see K. Davis, supra § 16.05, and we can conclude based upon them that the ALJ's decision is supported by substantial evidence. 29 U.S.C. § 160(e) (1970).

The dissent contends that, in holding that the Union sought to obtain work for carpenters generally rather than for Walsh's carpenters or other unit employees, we are reading the "belated rationalization of Board's counsel into the ALJ's opinion." Dissent at 19 n. 32. It is not true, however, that the ALJ made no findings on this point:

The purpose of such a provision is not to protect the work of employees already in the bargaining unit, but to enlarge the coverage of the bargaining unit by forcing the subcontractor to accept his contractor's agreement with the Union, thereby affecting his relationship with his own employees who must join a union not of their own choosing, and with potential employees who would have to use the Union's hiring hall.

Supp.App. 14–15 (footnote omitted). Thus we only affirm the findings of the ALJ rather than reading counsel's or our own post hoc rationalizations into his opinion. Moreover, the quoted passage also suggests an answer to the argument of the dissent that only presently existing Local 644 employees would be assigned the disputed work because if Kinnear were to agree to abide by the multi-employer agreement it would have to accept referrals from the union hiring hall. The dissent offers no proof that the hiring hall agreement is limited to existing employees; if it is not, that agreement would provide even greater pressure for Kinnear's employees to join the Carpenters' Union, since they would then have to use the union hiring hall to retain their jobs.

In summary, unlike the dissent, we find no need to speculate as to "findings that can be foreglimpsed as potentially emerging on a remand" or facts which may be "discerned" in a particular shape favorable to our theory of the case. Dissent at —— of 174 U.S.App.D.C., at 1160 of 533 F.2d. Rather, we rely on the findings as made by the ALJ and adopted by the Board, and we have determined them to be both properly arrived at and supported by substantial evidence.

**14.** 200 N.L.R.B. at 1061.

**15.** The Board's Decision and Order appended the following paragraph to the ALJ's decision:

4. By threatening, coercing, and restraining Walsh, Babcock & Wilcox, Morrison, Lord, and Eichleay, with an object of forcing or requiring those companies to either cease to do business with Kinnear Corporation or to compel Kinnear Corporation to employ the Respondent's members, the Respondent violated Section 8(b)(4)(ii)(B) of the Act.

200 N.L.R.B. at 1056.

**16.** Id. at 1061–62.

644 now petitions this court to review the Board's decision pursuant to statutory jurisdiction afforded by sections 10(e) and (f) of the Act, 29 U.S.C. § 160(e) and (f).[17]

## II.

This court has made plain its view that "economic action used to enforce a subcontracting clause which implicitly blacklist[s] all non-union subcontractors violate[s] § 8(b)(4)(ii)(B)." *Building & Construction Trades Council v. NLRB*, 117 U.S. App.D.C. 239, 240–41, 328 F.2d 540, 541–42 (1964), *citing Orange Belt District Council v. NLRB (Orange Belt I)*, 117 U.S.App.D.C. 233, 328 F.2d 534 (1964); *Orange Belt District Council v. NLRB (Orange Belt II)*, 124 U.S.App.D.C. 349, 365 F.2d 540 (1966); *Local 484, Bakery Wagon Drivers v. NLRB*, 116 U.S.App.D.C. 87, 321 F.2d 353 (1963); *District No. 9, International Association of Machinists v. NLRB*, 114 U.S.App.D.C. 287, 315 F.2d 33 (1962); *Retail Clerks Union Local 770 v. NLRB*, 111 U.S.App.D.C. 246, 296 F.2d 368 (1961). The rationale behind this principle is outlined in *Orange Belt I*, where Judge Wright, speaking for a division which included Chief Judge Bazelon and Judge Burger (now Chief Justice), state:

Secondary subcontracting clauses in the construction industry are lawful, under the *proviso* to Section 8(e), and economic force may be used to obtain them notwithstanding Section 8(b)(4)(A) . . . But under Section 8(b)(4)(B) such secondary clauses may be enforced only through lawsuits, and not through economic action.[18]

Secondary subcontracting clauses are distinguished from primary provisions by the fact that they are not " 'germane to the economic integrity of the principal work unit' " and do not seek only " 'to protect and preserve the work and standards [the union] has bargained for'," but instead " 'extend beyond the [contracting] employer and are aimed really at the union's difference with another employer'." *Orange Belt I*, 117 U.S.App.D.C. at 237, 328 F.2d at 538, *citing Retail Clerks, supra.* In this case Local 644's dispute was with Kinnear (with whom it had no contract) because Kinnear insisted on assigning work to members of the Ironworkers' union. Since Kinnear did not have a contract with either Local 644 or the Carpenters' International Union, and thus was not a primary employer, Local 644's actions against Kinnear were clearly secondary in focus. In *Building & Con-*

---

**17.** 29 U.S.C. § 160(e) (1970) provides:

(e) The Board shall have power to petition any court of appeals of the United States, or if all the courts of appeals to which application may be made are in vacation, any district court of the United States, within any circuit or district, respectively, wherein the unfair labor practice in question occurred or wherein such person resides or transacts business, for the enforcement of such order and for appropriate temporary relief or restraining order . . . .

29 U.S.C. § 160(f) (1970) provides:

(f) Any person aggrieved by a final order of the Board granting or denying in whole or in part the relief sought may obtain a review of such order in any United States court of appeals in the circuit wherein the unfair labor practice in question was alleged to have been engaged in or wherein such person resides or transacts business, or in the United States Court of Appeals for the District of Columbia, by filing in such a court a written petition praying that the order of the Board be modified or set aside.

\* \* \* \* \* \*

Upon the filing of such petition, the court shall proceed in the same manner as in the case of an application by the Board under subsection (e) of this section, and shall have the same jurisdiction to grant to the Board such temporary relief or restraining order as it deems just and proper, and in like manner to make and enter a decree enforcing, modifying, and enforcing as so modified, or setting aside in whole or in part the order of the Board . . . .

**18.** 117 U.S.App.D.C at 236, 328 F.2d at 537. *See also NLRB v. Local 445, IBT*, 473 F.2d 249, 253 (2d Cir. 1973) ("Congress intended that enforcement of such provisions may be effected only through the courts"); *NLRB v. IBEW and its Local 769*, 405 F.2d 159, 163 (9th Cir. 1968), *cert. denied*, 395 U.S. 921, 89 S.Ct. 1772, 23 L.Ed.2d 237 (1969) ("Congress did not intend to countenance provisions in such agreements that provide for enforcement by means of union coercion or economic pressure"); *cf. Local 48, Sheet Metal Workers v. Hardy Corp.*, 332 F.2d 682 (5th Cir. 1964); *Essex County & Vicinity District Council, UBCJ v. NLRB*, 332 F.2d 636, 641 (3d Cir. 1964).

*struction Trades Council, supra*, the same panel as in *Orange Belt I* made explicit that union signatory clauses—those requiring general contractors to use subcontractors who are "signatory to the agreements of the various construction local unions" [19]—by their terms have a secondary focus, and that attempts to secure their enforcement by strikes come within the proscription of section 8(b)(4)(ii)(B).[20] That is precisely the situation we have here.

■ The dissent attempts to make much of the fact that such subcontracting provisions in a collective bargaining agreement are lawful. This is not questioned; the contractor may voluntarily abide by the agreement if he wishes. However, when a union attempts to enforce such agreements by an economic boycott with a secondary objective, it uses unlawful means in an attempt to achieve an otherwise lawful purpose, and runs afoul of the law.[21]

The clause Local 644 sought to enforce through its picket line bound all members of the Home Builders Association of Tazewell County to subcontract any work within Local 644's jurisdictional claims only to persons or firms covered by a collective bargaining agreement with Local 644, and to subcontract work within the jurisdiction of the International Union only to parties who had signed an agreement with the International or who were willing to commit themselves in writing to abide by the terms of the agreement between Local 644 and the Home Builders Association. Because Walsh

had signed a contract with the International requiring it to abide by the terms of local union agreements, it was bound by this provision. If Walsh assigned to a subcontractor represented by the Ironworkers tasks fairly claimable by Local 644 or the Carpenters International, the assignment was violative of the contract Walsh had negotiated with the International. But, according to the holding of *Orange Belt I*, Local 644 could not redress its grievance through economic action if the contractual provision on subcontracting it sought to enforce had a secondary focus.

Local 644's actions had at least two objectives—both unlawful when the Union sought to enforce the contract as written. The Union's demands sought either to have Kinnear become a party to its collective bargaining agreement with the Home Builders Association, or to have Walsh cease doing business with Kinnear altogether so as to allow International Union members to perform the disputed work. A clause forbidding subcontracting under any circumstances would have achieved the latter result and would undisputably have been dedicated to preserving the economic integrity of the unit, a purpose emphatically approved by the Act.[22] But the breadth of the subcontracting limitations in the agreement, to which Union representatives constantly referred as stating their objectives (*see text* at —— –—— of —— U.S.App. D.C., at 1142–1144 of 533 F.2d *supra* and App. 111) indicates that the demands and objectives of its strike exceeded mere work

---

**19.** 117 U.S.App.D.C. at 240, 328 F.2d at 541.

**20.** *Id.* at 240–41, 328 F.2d at 541–42.

**21.** *See* note 18 *supra* and accompanying text. The situation is analogous to the law of conspiracy, in which it is well established that a combination having as its object the accomplishment of a lawful purpose is condemned when unlawful means are used in an attempt to consummate that purpose. *See, e. g., Truax v. Corrigan*, 257 U.S. 312, 327, 42 S.Ct. 124, 66 L.Ed. 254 (1921); *Duplex Printing Press Co. v. Deering*, 254 U.S. 443, 465, 41 S.Ct. 172, 65 L.Ed. 349 (1921); *Pettibone v. United States*, 148 U.S. 197, 203, 13 S.Ct. 542, 37 L.Ed. 419 (1893); 16 Am.Jur.2d *Conspiracy* § 1 (1964); 15A C.J.S. *Conspiracy* § 4 (1967).

**22.** *See, e. g., Local 484, Bakery Wagon Drivers v. NLRB*, 116 U.S.App.D.C. 87, 92, 321 F.2d 353, 358 (1963):

The union seems to suggest that it was only demanding compliance with the blanket no-subcontracting clause, which would be legal. The court went on to hold that the particular clause, which the union sought to enforce by a strike, actually required "the cessation of business with non-complying subcontractors," that is, those subcontractors with which the union had a labor dispute. The court concluded that a strike to serve this purpose constituted impermissible interference in the labor dispute of a remote employer in violation of section 8(b)(4)(B).

preservation for the unit represented by Local 644. The Union was equally concerned and would have been satisfied, as was decisively indicated by Guler's quoted testimony, *supra* at —— – ——, of —— U.S. App.D.C. at 1142–1143 of 533 F.2d, with increasing the number of employees covered by its collective bargaining agreement in order to expand the size of the bargaining unit and augment the power of the International Union. The case law leaves no doubt that secondary pressures cannot be employed to that end. This finding is supported by substantial evidence and hence it would be in excess of our authority to remand for further consideration as the dissent suggests.

Local 644 seeks support from the Supreme Court's *National Woodwork* [23] decision and from cases in which this court relied on that opinion to discredit the Board's use of the right-to-control test of secondary action.[24] The Union's argument is twofold: first, it contends that *National Woodwork* defined work preservation strikes as primary activity, thus precluding a section 8(b)(4)(B) violation on the facts this case presents. Second, it argues that *National Woodwork* forbids the use of a *per se* right-to-control standard in testing the primary focus of an economic action.

*National Woodwork*, which dealt with a "will not handle" provision, held that a boy-cott conducted for the sole purpose of preserving traditional *unit* work and directed at an immediate employer was not violative of section 8(b)(4)(B) in spite of ancillary secondary effects. The *Woodwork* Court cited the finding of the Trial Examiner that the provision at issue was "not concerned with the nature of the employer with whom the contractor [did] business nor with the employment conditions of other employers or employees." [25] To demonstrate the absence of "union objectives elsewhere," [26] the Court majority also emphasized that the union "refused to hang prefabricated doors whether or not they bore a union label." [27] The clause the boycott in that case sought to enforce guaranteed to union members in the immediate unit the right to fit "blank" doors.

In contrast to *National Woodwork*, the subcontracting restrictions that the Union demanded be applied here seek either to have the jobsite work performed by a contractor who holds a contract with the Carpenters' International Union or one of its subordinate unions, *or* to have that work performed by a contractor who has agreed in writing to be bound by the terms of a union-drafted agreement *or* to acquire such traditional work for members of Local 644. Therefore it is obvious that the demands of Local 644 extended beyond preserving traditional work for the unit,[28] and

**23.** *National Woodwork Manufacturers Ass'n v. NLRB*, 386 U.S. 612, 87 S.Ct. 1250, 18 L.Ed.2d 357 (1967).

**24.** *Local 742, Carpenters v. NLRB*, 144 U.S. App.D.C. 20, 444 F.2d 895, *cert. denied*, 404 U.S. 986, 92 S.Ct. 447, 30 L.Ed.2d 371 (1971); *Local 636, Plumbers & Pipefitters v. NLRB*, 139 U.S.App.D.C. 165, 430 F.2d 906 (1970).

**25.** 386 U.S. 612, 617, 87 S.Ct. 1250, 1254, 18 L.Ed.2d 357.

**26.** *Id.* at 644, 87 S.Ct. at 1250.

**27.** *Id.* at 646, 87 S.Ct. at 1269.

**28.** The dissent contends that when the union demanded work "for carpenters" it meant *only* work for carpenters of Local 644, but there is nothing in the evidence to support such an assertion. Local 644's demand was basically grounded on the written terms of the International agreement and, as the Union's business agent testified (App. 111), that demand would have been satisfied by having Kinnear assign the work in question to any carpenter. *See* note 5 *supra*. Therefore, when the dissent asserts that Local 644 only demanded work for carpenters of its unit it is really seeking to alter or ignore the terms of the written agreement.

In this regard our decision is supported by the holding of the Second Circuit in *NLRB v. Nat'l Maritime Union*, 486 F.2d 907 (2d Cir. 1973), *cert. denied*, 416 U.S. 970, 94 S.Ct. 1993, 40 L.Ed.2d 559 (1974), involving a clause which provided that if the contracting shipowner sold a ship to a shipper not under contract with the National Maritime Union (NMU), the crew would be provided by NMU and the selling shipowner must require from the purchaser an undertaking to abide by the NMU contract. A panel including Judges Lumbard and Friendly held that such a clause was secondary in nature, since "the union's aim [was] to convert any prospective purchaser to an NMU contract

could have been satisfied if Kinnear's scaffolding had been erected by any member of the Carpenters' International Union. The Union's strike objectives were therefore clearly not limited to preserving work for Local 644 unit members but also included the objective of changing the bargaining representative of the employees of a contractor with whom it did not have a contract. In other words, as the ALJ stated, "an object of Local 644 was to cause Walsh, the neutral general contractor, to change its method of doing business with Kinnear, the subcontractor, with whom Local 644 had a primary dispute over the assignment of work" (Supp.App. 16). This is a classic example of a "union objective elsewhere." Although Local 644 contends that its action is within the permissible limits of the "on site" building construction exclusion of section 8(e), when Congress enacted that proviso it emphatically indicated that it intended to retain the pre-existing law relating to secondary boycotts in the construction industry:

> The committee of conference does not intend that this proviso should be construed so as to change the present state of the law with respect to the validity of this specific type of agreement relating to work to be done at the site of the construction project or to remove the lim-

itations which the present law imposes with respect to such agreements. Picketing to enforce such contracts would be illegal under the *Sand Door* case (*Local 1976, United Brotherhood of Carpenters v. NLRB*, 357 U.S. 93, 78 S.Ct. 1011, 2 L.Ed.2d 1186 (1958)). To the extent that such agreements are legal today under section 8(b)(4) of the National Labor Relations Act, as amended, the proviso would prevent such legality from being affected by section 8(e). The proviso applies only to section 8(e) and therefore leaves unaffected the law developed under section 8(b)(4). The *Denver Building Trades* case and the *Moore Drydock* cases would remain in full force and effect. The proviso is not intended to limit, change, or modify the present state of the law with respect to picketing at the site of a construction project.

Labor-Management Reporting and Disclosure Act of 1959 (Landrum-Griffin Act), Conference Report of the U.S. House of Representatives, H.R.Rep.No.1147, 86th Cong., 1st Sess. 39–40 (1959) (report on S. 1555), U.S.Code Cong. & Admin.News 1959, pp. 2318, 2511. *See also Northeastern Indiana Building & Construction Trades Council*, 148 N.L.R.B. 854, 857–58 (1964), *vacated on other grounds*, 122 U.S.App.D.C. 220, 352 F.2d 696 (1965); *Local 644, Carpen-*

. . . ." 486 F.2d at 912. There, as here, the court found the fact that the clause would not preserve work for unit employees (*i. e.*, the crew of the ship prior to the sale) but rather would benefit *the union as a whole* to be a "relevant factor":

> While the cases may use the bargaining unit as a yardstick for the permissible scope of a work preservation clause, we are aware of none that do so where, as here, the suggested bargaining unit is many times larger than the actual work force of the primary employer and where the vast majority of the workers in the supposed unit have had no contact at all with the employer.

486 F.2d at 914. The *Nat'l Maritime* court also observed that

> for the NMU to bargain for a clause that gives it the right to continue manning the ship from its hiring hall goes beyond "work preservation" of the kind sanctioned in *National Woodwork* and the lower court cases in this area. The circumstances of the arrangement make it clear that the NMU's mo-

tivation was to protect the union's interest, rather than the interest of the work unit and its members.

*Id.* at 913. Similarly here, the goal of Local 644 was not to preserve work for unit members but to augment the power of the International Union. We hold that such an objective is secondary and that economic action furthering it is prohibited by section 8(b)(4)(B).

*NLRB v. Local 28, Sheet Metal Workers*, 380 F.2d 827 (2d Cir. 1967), a case cited by the dissent, is clearly distinguishable. There, the dispute was between two locals of the *same* International Union over which would supply dampers to a certain jobsite. In threatening economic action if the dampers were not manufactured by its unit members, Local 28 was obviously furthering its own interests rather than those of the union as a whole. The case was distinguished by the same circuit in the *Nat'l Maritime* decision, on the basis, *inter alia*, that in *Local 28* the "specific instance of application of clause did not involve impermissible secondary objectives." 486 F.2d at 913.

*ters & Joiners,* 200 N.L.R.B. 1056, 1061 (1972); Supp.App. 16.

This court's decisions following *National Woodwork* have reiterated that permissible work preservation strikes must be blind to the organizational status of remote employers. In *Local 742, Carpenters & Joiners v. NLRB,*[29] we disapproved exclusive reliance on a *per se* right-to-control standard to test the primary focus of a work preservation strike, but indicated in unequivocal terms the sort of activity which could be classified as secondary:

> The paradigmatic example of secondary activity is a union's pressuring of its members' employer to cease dealing with another party simply because the other party does not employ union labor[;] in that case, the union's objective is addressed strictly to the labor relations of *another* employer.[30]

In *Local 636, Plumbers & Pipefitters v. NLRB,*[31] a case strikingly similar to *Local 742, supra,* we noted that a work preservation strike against an immediate employer prompted by disagreement with the labor policies of a remote employer presented "the usual type of 'secondary' object."[32] And the majority in our recent decision in *Local 638, Plumbers & Pipefitters (Enterprise Association) v. NLRB*[33] stated that a situation which could taint a valid work preservation objective would be a union's discrimination "in its work preservation tactics on the basis of the organizational status" of an employer with whom its immediate employer had a contract.[34]

The principle that a secondary boycott cannot legally be aimed solely at modifying the organizational status of an employer with whom a union has no contract is rudimentary. The complication of this case is that the restriction the Union sought to enforce was in the alternative, and required *either* that Kinnear change the bargaining representative of those employees who performed the disputed work *or* that Walsh decline to subcontract the work to employees not represented by Local 644. But it is axiomatic that economic action violates section 8(b)(4)(B) when *an object*—not necessarily the sole object—of the action is secondary. *NLRB v. Denver Building & Construction Trades Council,* 341 U.S. 675, 689, 71 S.Ct. 943, 95 L.Ed. 1284 (1951); *IBEW v. NLRB,* 341 U.S. 694, 700, 71 S.Ct. 954, 95 L.Ed. 1299 (1951); *Local 419, Carpet Layers v. NLRB,* 151 U.S.App.D.C. 338, 345 n. 13, 467 F.2d 392, 399 n. 13 (1972).[35] The mere

---

**29.** 144 U.S.App.D.C. 20, 444 F.2d 895, *cert. denied,* 404 U.S. 986, 92 S.Ct. 447, 30 L.Ed.2d 371 (1971)

**30.** *Id.* at 26 n. 13, 444 F.2d at 901 n. 13 (emphasis in original).

**31.** 139 U.S.App.D.C. 165, 430 F.2d 906 (1970).

**32.** *Id.* at 168, 430 F.2d at 909.

**33.** 172 U.S.App.D.C. 225, 521 F.2d 885 (*en banc,* 1975), *cert. granted,* —— U.S. ——, 96 S.Ct. 1101, 47 L.Ed.2d 311 (1976) (No. 75–777).

**34.** *Id.* at 244 n. 44, 521 F.2d at 904 n. 44. Thus, what the dissent characterizes as a "*per se* approach to 'union signatory' subcontracting clauses," dissent at —— of 175 U.S.App.D.C., at 1156 of 533 F.2d, is in fact reliance upon a line of cases decided by this court which rejected a *per se* test and in its place analyzed and interpreted activity of the nature encountered here as secondary.

**35.** Contrary to the assertion of the dissent, none of these cases dealt with an "intermediate objective, necessary to the attainment of the ultimate purpose." Dissent at —— of 175 U.S.App.D.C. n. 20, at 1160 of 533 F.2d n. 20. In *IBEW v. NLRB,* for example, *an object* of the strike by electrical workers against a carpentry subcontractor was found to be the pressuring of the general contractor to employ a unionized electrical subcontractor. This was no intermediate objective, but rather the end goal of the striking union.

We are not presently required to decide whether, as the dissent contends, the proscribed object must be a substantial one, since the boycott in this case was in fact aimed in significant part at forcing Kinnear to agree to the jurisdictional claims of Local 644. The breadth of the subcontracting limitations written into the Union's contract with Walsh, *see* text at —— of 175 U.S.App.D.C., 1146–1148 of 533 F.2d *supra,* and the acts and statements of union representatives, *see* text at —— of 175 U.S.App.D.C., 1142–1144 of 533 F.2d *supra,* are concrete indicators that secondary organizational objectives were included and thus substantially more was involved than merely preserving traditional work; these elements and the fact that both alternatives provided for in the subcontracting provisions of the contracts (*id.*) were organizational in nature creates more

existence of alternative union objectives here does not transform the one *objective* that is illegal into an "incidental secondary effect," as the dissent appears to contend. Dissent at —— of 175 U.S.App.D.C., at 1162 of 533 F.2d. Far from being incidental, the objective in question here was considered substantial enough to be written into the union contract.

Once Walsh had engaged Kinnear to fabricate steel doors off-site and then to erect the requisite scaffolding and install the power mechanisms on-site, the object of the Union's strike was—as its representatives repeatedly stated—logically directed toward changing Kinnear's organizational status, or toward forcing Kinnear off the site because it would not sign an agreement. The Union's stated objective could be realized only by one of such methods. But it is illegal to strike for either of such objectives, and so the strike clearly had a secondary object and was illegal despite the fact that Walsh had violated its agreement not to employ subcontractors who had not signed an agreement with Local 644.[36] Our

---

than a "speculative gossamer of a possibility" that the Union's actions were improperly directed. Moreover, as the majority stated in *Local 638, Plumbers & Pipefitters (Enterprise Association) v. NLRB,* 172 U.S.App.D.C. 225, 521 F.2d 885 (*en banc,* 1975), *cert. granted,* 424 U.S. 908, 96 S.Ct. 1101, 47 L.Ed.2d 311 (1976) (No. 75–777): "[E]ven when we find that the union's primary motivation is work preservation, we will hold its actions unlawful under § 8(b)(4)(B) if they are tainted by secondary objectives." *Id.* 172 U.S.App.D.C. at 244 n. 44, 521 F.2d at * MESSAGE(S) *MORE SECTIONS FOLLOW904 n. 44. Thus, even were we to assume *arguendo* that Local 644's primary motivation was work preservation we would still reach the same result.

Nor do we fail to distinguish between impermissible secondary *objectives* and permissible secondary *effects* of primary union objectives. Unlike the situation in *Enterprise, id.* at 240 n. 36, 521 F.2d at 900 n. 36, where the majority found insufficient evidence to prove that the activity was more than an "ancillary effect of the [union's] primary action," here the proscribed secondary objective clearly appears from the Union's efforts to enforce the requirements of the contract itself.

**36.** The dissenting opinion asserts that the "central teaching" of *Local 638, Plumbers & Pipefitters (Enterprise Assn.) v. NLRB,* 172 U.S.App. D.C. 225, 521 F.2d 885 (*en banc,* 1975), *cert granted,* 424 U.S. 908, 96 S.Ct. 1101, 47 L.Ed.2d 311, 44 U.S.L.W. 3471 (U.S. Feb. 23, 1976) (No. 75–777), is that "the neutrality of the contracting employer is determined by looking at the position he was in before he tied his hands by subcontracting the disputed work," and that therefore "[t]he dilemma Walsh brought upon itself cannot supply the determinative ground for finding Walsh to be a neutral employer embroiled in a controversy not of its own making." Dissent at —— of 175 U.S.App.D.C., at 1166 of 533 F.2d. This, however, mistakes the focus of our required inquiry and the recognition by *Enterprise* that notwithstanding the collective bargaining agreement of the general contractor the union may be held to violate section 8(b)(4)(B) where "one objective is a prohibited secondary one." 172 U.S.App.D.C. at 243, 521 F.2d at 903. Since one of the ways Local 644 could have succeeded in its strike against Walsh would have been for Kinnear to submit to the International Union's jurisdictional demands, the law directs us to be interested in protecting *Kinnear's employees* from the intrusions of Local 644; the availability to Walsh of a remedy under section 8(b)(4)(D) cannot change this focus. The fact that Walsh is able to take advantage of the law's concern for Kinnear's employees to insulate itself from work preservation strikes by its own union is only incidental to our main endeavor. Indeed, that incongruous result is made possible by the union's efforts to enforce the broad organizational wording of the union signatory clause which the Carpenters' International obtained. *Thus, while the dissent may well deplore the avoidance by Walsh of its contractual responsibilities, it cannot object to the law protecting the right of Kinnear and his employees to be free of the organizational claims of Local 644.*

The above-quoted assertion of our colleague would also deny to employees the freedom of choice guaranteed by the statute. Our decision in *Enterprise* should not be so broadly interpreted. The quotation attempts to read *Enterprise* as supporting the view that in all instances a *prior* agreement by a contractor limiting his choice of subcontractors to those that recognized the Carpenters' jurisdiction is a defense to a violation of section 8(b)(4)(B). Substantially the same contention was made by the Carpenters' union in *Local 1976, Carpenters & Joiners v. NLRB,* 357 U.S. 93, 104, 78 S.Ct. 1011, 2 L.Ed.2d 1186 (1958), when it claimed that an employer's *prior agreement* to a hot cargo provision was a defense against a charge that a strike to enforce the restrictions on "hot cargo" was a violation of the secondary boycott provisions of the Act. In that case Justice Frankfurter's majority opinion sustained the decision of the NLRB "reject[ing] the argument as not comporting with the legislative purpose to be drawn from the statute, projected onto the practical realities of labor relations." *Id.* at

conclusion in *Orange Belt I* that a union signatory clause can be enforced only by a lawsuit [37] also holds true here, where the signatory provision was joined with a work preservation stipulation, since the alternative purpose of the strike to enforce such subcontracting restriction was—as indicated by the Union demands—the proscribed object of pressuring a remote employer to accept new jurisdictional claims of the Union.

The Union also assails the analysis by which the ALJ reached his conclusions, contending that *National Woodwork* forbade the use of a "powerless to resolve" (right-to-control) test of secondary conduct.[38] The ALJ used the phrase in

105, 78 S.Ct. at 1019. The opinion further reasoned

> that the freedom of choice for the employer contemplated by § 8(b)(4)(A) [presently partially contained in section 8(b)(4)(B)] *is a freedom of choice at the time the question whether to boycott or not arises in a concrete situation calling for the exercise of judgment on a particular matter of labor and business policy.* Such a choice, free from the prohibited pressures—whether to refuse to deal with another or to maintain normal business relations on the ground that the labor dispute is no concern of his—must as a matter of federal policy be available to the secondary employer *notwithstanding any private agreement entered into between the parties.* See *National Licorice Co. v. National Labor Relations Board,* 309 U.S. 350, 364, 60 S.Ct. 569, 577, 84 L.Ed. 799. This is so because by the employer's intelligent exercise of such a choice under the impact of a concrete situation when judgment is most responsible, and not merely at the time a collective bargaining agreement is drawn up covering a multitude of subjects, often in a general and abstract manner, Congress may rightly be assumed to have hoped that the scope of industrial conflict and the economic effects of the primary dispute might be effectively limited.
>
> Certainly the language of the statute does not counter such an interpretation. The employees' action may be described as a "strike or concerted refusal," and there is a "forcing or requiring" of the employer, even though there is a hot cargo provision. *The realities of coercion are not altered simply because it is said that the employer is forced to carry out a prior engagement rather than forced now to cease doing business with another.* A more important consideration, and one peculiarly within the cognizance of the Board because of its closeness to and familiarity with the practicalities of the collective bargaining process, is the possibility that the contractual provision itself may well not have been the result of choice on the employer's part free from the kind of coercion Congress has condemned. It may have been forced upon him by strikes that, if used to bring about a boycott when the union is engaged in a dispute with some primary employer, would clearly be prohibited by the Act. Thus, to allow the union to invoke the

> provision to justify conduct that in the absence of such a provision would be a violation of the statute might give it the means to transmit to the moment of boycott, through the contract, the very pressures from which Congress has determined to relieve secondary employers.
>
> Thus inducements of employees that are prohibited under § 8(b)(4)(A) in the absence of a hot cargo provision are likewise prohibited when there is such a provision. . . . In order to give effect to the statutory policy, it is not unreasonable to insist, as the Board has done, that even when there is a contractual provision the union must not appeal to the employees or induce them not to handle the goods. Such a rule expresses practical judgment on the effect of union conduct in the framework of actual labor disputes and what is necessary to preserve to the employer the freedom of choice that Congress has decreed. On such a matter the judgment of the Board must be given great weight, and we ought not set against it our estimate of the relevant factors.

357 U.S. at 105–107, 78 S.Ct. at 1019 (emphasis added).

37. *See* text at note 18 *supra.* The Board's General Counsel suggests a practical reason why enforcement by lawsuit would be preferable in this situation.

> It should also be noted that the Union did not need to tie up five neutral contractors in order to compel Walsh to arbitrate. It could and did bring suit in District Court to enforce whatever contractual duty Walsh had to arbitrate the subcontracting clause. . . . Clearly, the initiation of that lawsuit should have ended the continued pressure on the neutral contractors.

NLRB Brief at 25 n. 48.

38. As we noted in *Enterprise,* the Supreme Court reserved judgment on the test in *National Woodwork,* 386 U.S. at 616 n. 3, 87 S.Ct. 1250. This court split 5–4 in deciding whether the Supreme Court disapproved the test by implication in that case. *Local 638, Plumbers & Pipefitters (Enterprise Association) v. NLRB,* 172 U.S.App.D.C. 225, 521 F.2d 885 (en banc, 1975), *cert. granted* 424 U.S. 908, 96 S.Ct. 1101, 47 L.Ed.2d 311, 44 U.S.L.W. 3471 (U.S. Feb. 23, 1976) (No. 75–777).

question only once, as he summarized his "Concluding Findings":

> It was Kinnear with whom Local 644 had a primary dispute over which *union* was to perform the work in dispute, and Walsh was a secondary employer, embroiled in a dispute which it was powerless to resolve except by unilaterally changing the terms of its subcontract with Kinnear or by ceasing to do business with it.[39]

Since it was essential that he consider all the surrounding circumstances, it was appropriate that he comment on this factual feature of the case. For three reasons, however, the above-quoted sentence does not represent impermissible reliance on a right-to-control standard.

 First, it is at best a minor basis of the Board's decision. The rationale of the opinion the Board adopted was that section 8(b)(4)(B) proscribes economic action taken to enforce the union signatory provisions of the agreement. This proposition was derived from our opinions in *Orange Belt I & II, supra,* in *Bakery Wagon Drivers, supra,* and in *Local 710, Meat & Highway Drivers v. NLRB,* 118 U.S.App.D.C. 287, 294–95, 335 F.2d 709, 716–17 (1964),[40] and not from application of the right-to-control test to determine whether Walsh had the right to reassign the disputed tasks to members of Local 644. Following the language of those decisions, the ALJ ruled that the clause the Union sought to enforce was "an organizational device. directed against the subcontractor, designed to preclude a signatory contractor from doing business with a nonsignatory subcontractor," to "enlarge the coverage of the bargaining unit" by forcing employees to "join a union not of their own choosing . . . ."[41] The validity of his conclusion that a strike serving these purposes violated section 8(b)(4)(B) is not undermined by his reference to the fact that Walsh was "powerless to resolve" the dis-

pute. It is one circumstance among many that should be considered. When a union strikes an employer for an objective he is powerless to grant it is only common sense to conclude that the union intended by its strike to achieve its objective through other means. No other deduction is reasonable.

 Second, even if we were to assume *arguendo* that this single finding had been a major basis for the Board's decision, the point that Walsh lacked the means to satisfy the demands of the Union's strike would not be superfluous to this litigation. In the context of straight work preservation a general contractor's lack of legal power to reassign disputed work may not be the complete answer to the question whether he is the proper target of a boycott; the fact that he may have contracted away that power, thus binding his own hands, or that he may have retained the means to induce secondary employers to act in a manner consistent with his work preservation understanding may be entitled to some weight. But strikes, such as we have here, to enforce union signatory provisions stand on an altogether different legal footing. That an immediate employer may not be struck to force a remote employer to recognize a different bargaining representative is fundamental to our labor law. Categorically a general contractor lacks the legal power to coerce or induce a change in the labor relations of a subcontractor, regardless of the terms of his collective bargaining agreement with his own employees. Thus, while an employer's right to control may be merely one item of factual evidence concerning the object of a strike with work preservation aspects, when the strike seeks to enforce a union signatory clause in a contract that evidence points to a significant legal conclusion concerning the use of economic action to alter the labor relations of other parties.[42] We are not prohibited,

---

**39.** 200 N.L.R.B. at 1061.

**40.** *See also* cases cited at page ──── of 175 U.S.App.D.C., page 1145 of 533 F.2d *supra.*

**41.** 200 N.L.R.B. at 1061.

**42.** The Board's General Counsel explained in his brief that the ALJ's "powerless to resolve" finding was offered in this sense:

as the dissent seeks to have us be, from gleaning a union's intended object from the clear language of such written provisions.

■ Third, the Union's claim that the Board has relied on a *per se* right-to-control test ignores the scope of the Board's inquiry into the circumstances of this dispute. Actually, when the entire opinion of the ALJ is read, the contention that the Board relied on a *per se* test fades into mere unsupported assertion: the ALJ's conclusion was made only after consideration of all the relevant facts and principles and was not reached automatically or mechanically. His opinion outlines the facts, the law and the reasoning upon which he relied. Although the Board noted that Walsh lacked the power to change Kinnear's assignment of scaffolding and power mechanism work in compliance with the Union demand, its decision hinged on critical evidence: the Union's attempt to proselytize employees of a secondary employer, and the object which was implicit in the subcontracting restrictions that the representatives of the Union stated it was seeking to enforce. In our decision in *Local 638, Plumbers & Pipefitters (Enterprise Association) v. NLRB*, 172 U.S. App.D.C. 225, 521 F.2d 885 (*en banc*, 1975), *cert. granted*, 424 U.S. 908, 96 S.Ct. 1101, 47 L.Ed.2d 311, 44 U.S.L.W. 3471 (U.S. Feb. 23, 1976) (No. 75–777), we ordered the

Board to reconsider a ruling predicated on a right-to-control determination, and offered the specific suggestion that "such a reconsideration might challenge the Board's assumption that the union was not in fact attempting to organize . . . employees [of a remote employer]." [43] Consistent with numerous decisions of this court,[44] the *Enterprise* majority recognized that evidence of such an organizational purpose would taint an otherwise valid work preservation strike. When the Board has found within the plain terms of the collective bargaining agreement, and in the Union's stated objective to enforce the dictates of that agreement, irrefutable proof that the Union's strike has an object proscribed by section 8(b)(4)(B), a remand for further consideration based on the speculation that there were other surrounding circumstances which the Union had not presented previously would be a meaningless elevation of form over substance not mandated by the *National Woodwork* decision.

### III.

■ The Union advances the ostensibly exculpatory argument that the subcontracting provision it sought to enforce was actually far less restrictive of its employer's options than an absolute ban on subcontracting: Walsh was given latitude in se-

The Board did not find Walsh to be a neutral because of contractual commitments transferring control over the work to Commonwealth Edison or others, and the Union was not objecting to the fact that [carpenter] work was leaving the Walsh [Carpenters'] unit. The Carpenters' complaint was that the person receiving Walsh's subcontract (Kinnear) did not have a contract with the Carpenters and was assigning work to Ironworkers. With respect to those complaints, Walsh clearly was a neutral, unoffending, third party. In stating that Walsh was "powerless to resolve" the Union's dispute with Kinnear (S.A. 15) the Board's Administrative Law Judge was not invoking "right to control," but simply describing Walsh's position as a "third party who has no concern in [the dispute]," or an "unoffending employer" caught in a controversy not his own. NLRB Brief at 23–24.

The Union also questions the Board's conclusion that Walsh was not a primary employer with respect to Local 644, suggesting the argu-

ment that a strike brought against an employer who has breached his collective bargaining agreement with the striking union must always be primary. We responded to this position in *Building & Construction Trades Council v. NLRB*, 117 U.S.App.D.C. 239, 240 n. 8, 328 F.2d 540, 541 n. 8 (1964):

Contrary to the union's contentions here, the contracting employer "did not become the primary employer merely because * * * [there] was a violation of the terms of the agreement between it and the union." *Local 636, United Association, etc. v. N.L.R.B.*, 108 U.S.App.D.C. 24, 30, 278 F.2d 858, 864 (1960). One must rather look to see whether the clause violated was primary or secondary as to the contracting employer.

43. 172 U.S.App.D.C. at 245 n. 46, 521 F.2d at 905 n. 46.

44. *See generally* cases cited in text accompanying note 35 *supra*.

lecting the employees to perform particular tasks, limited only by his agreement to employ union signatory labor. But the Union cannot defend against the charge that it has exerted unlawful secondary pressures by insisting that it has been solicitous of the employer with whom its International union has a collective bargaining agreement. The Act allows a broad range of activity designed to pressure primary employers into granting concessions and honoring commitments, but categorically forbids economic action undertaken for the purpose of pressuring secondary employers. This principle underlies the passage from *Orange Belt I* quoted above [45]: a union may strike to obtain a construction subcontracting clause which exacts a signatory obligation from secondary employers, since the effort to gain this concession is directed only against the union's immediate employer, but it may not strike to enforce the provision, for to do so is to force secondary employers to alter their union status or to "cease doing business" with the struck primary altogether. In the context of this case, Local 644's attempt to compel Walsh to abide by the subcontracting restrictions had the object of forcing Kinnear off the site unless it agreed to the Union's jurisdictional claims. The terms of section 8(b)(4)(ii)(B) clearly proscribe this action, and the language of section 8(e) does not validate it.[46]

The Union concedes that economic action taken in support of a demand that a general contractor "replace [a] non-signatory (non-union) subcontractor with a signatory (union) subcontractor" represents a "classic secondary boycott" with an "illegal cease doing business objective,"[47] but attempts to justify its strike as unrelated to Kinnear's

signatory status. By the Union's accounts, "[n]o demand was made upon Kinnear. Nothing was sought of Kinnear."[48] The ALJ considered and rejected this argument in his decision:

> [I]t is made to appear as if Local 644 merely wanted Walsh to honor a commitment to use its own carpenter employees for work within the Carpenters' claimed jurisdiction, whereas Local 644 was in fact insisting that Kinnear assign the erection of scaffolding over 14 feet, and the installation of the door mechanisms to its members generally rather than to members of the Ironworkers Union.[49]

The ALJ discarded the Union's argument because its portrayal of the objects of its strike was utterly unrealistic. It must also be remembered that Local 644 was necessarily relying, in the first instance, on the agreement between Walsh and the International Union and not any agreement to which it was a direct party. The dispute between Walsh and the Union could have been resolved only if Walsh had induced Kinnear to observe the carpenters' jurisdictional claims by assigning the disputed work to members of the Carpenters' International Union (including but not limited to members of Local 644). The Union's claim that a strike to these ends did not constitute a "demand" on Kinnear flies in the face of reason, the evidence, and the decisions of the ALJ and the Board.

■ As an attempted third justification of its action, the Union insists it sought only to enforce an arbitration clause in its agreement with the Home Builders Association, not to force Kinnear to become a signatory or quit the project. Even if it were conceded that the Union sought arbi-

---

**45.** See text accompanying note 18 *supra.*

**46.** In *Local 484, Bakery Wagon Drivers v. NLRB,* 116 U.S.App.D.C. 87, 321 F.2d 353 (1963), Judge Wright explained that the use of a no-subcontracting clause to compel a general contractor to "subcontract only with employers with whom the union has no labor dispute" would "destroy the basic premise upon which subcontracting clauses, which *prima facie* violate subsection (B), are permitted, *i. e.,* that the union is seeking to protect some legitimate

economic interest of the employees of [the general contractor], and not just using its position [with the general contractor] to enforce its demands against subcontractors." *Id.* at 92, 321 F.2d at 358.

**47.** Petitioner's Brief at 32.

**48.** *Id.* at 33.

**49.** 200 N.L.R.B. at 1061.

tration, that would not alter its objectives in striking or validate an otherwise illegal secondary boycott. The facts also belie the Union's contentions that it was only attempting to secure arbitration of its demands. The prospect of arbitration was raised for the first time in the telegram the Union sent Walsh on the evening of November 9, *after* all members of Local 644 had walked off the jobsite.[50] Walsh received the telegram on November 10, presumably some time after 7:10 A.M., when Local 644's picket line was set up.[51] Thus the fact that the Union's placards charged Walsh with a "Refusal to Arbitrate" as well as a "Violation of Contract" does not disguise the true cause of its strike, *i. e.,* the failure of Walsh and Kinnear between September 20 and November 9 to comply with the subcontracting restrictions of the Walsh agreement with the International. Moreover, Walsh did not steadfastly refuse to arbitrate, as the Union suggests; instead, through a telegram sent at 5:15 P.M. on November 9, well before it received the Union's telegram demanding arbitration, Walsh requested the intervention of the National Joint Board for the Settlement of Jurisdictional Disputes, an arbitral forum which could involve and bind both the Carpenters and the Ironworkers. Resolution of the dispute by this body would have alleviated Walsh's justifiable fear "that an arbitrator's ruling limited to Carpenters and its subcontracting clause would not prevent Ironworkers from continuing to claim the work, which could lead to a walkout by Ironworkers and renewed pressure from Carpenters."[52]

 Finally, the Union points to the fungibility of carpenters on the project as evidence that its pressure was directed only toward parties in the unit, and solely for the purpose of preserving its economic integrity. As carpenters were laid off by one employer, they went into a pool composed of all carpenters on the project, to be re-hired on a rotating basis by another employer. If the Union intends to suggest that the general contractor and his subcontractors on a construction site constitute a single unit, that "employees of one [are *ipso facto*] employees of the other," then it has ignored the holding of *NLRB v. Denver Building & Construction Trades Council,* 341 U.S. 675, 690, 71 S.Ct. 943, 952, 95 L.Ed. 1284 (1951), to the contrary. Rotation among carpenters did not involve ironworkers and cannot be deemed to have included them in Local 644's unit. Once Kinnear was awarded the task of installing the seven steel doors, Walsh could not compel Kinnear to use *any* carpenters to work on the tall scaffolding and the power mechanisms, regardless of their immediate employer, without pressuring the Ironworkers' Union to accept Local 644's jurisdictional claims. We have amply documented the impermissibility of that purpose.

### Conclusion

 Both the ALJ and the Board determined that Local 644 struck with the object of enforcing the union signatory aspect of the subcontracting restrictions it had negotiated with the Home Builders Association. These became applicable, and only as one of several alternatives, because of a limited provision of Walsh's agreement with the International. The stated and logical purpose of the Union's economic action was to compel ironworkers and Kinnear to abide by the carpenters' jurisdictional claims. The fact that the strike was successful, that it led to the capitulation of Kinnear and the Ironworkers' Union, does not justify the Union's action. We perceive no reason to deviate from our longstanding position that a union violates section 8(b)(4)(B) when it strikes its immediate employer to ensure

---

**50.** Robert Guler, business agent for Local 644, conceded that no mention was made of the prospect of arbitration at the stormy meeting of November 9, and that the Union first decided to mention arbitration to Walsh in the telegram Walsh received on November 10, after the strike had begun. App. 108–09.

**51.** App. 37.

**52.** NLRB Brief at 25 n. 46 (emphasis added).

that he contracts only with parties signatory to the union's collective bargaining agreement. Accordingly, since there is substantial evidence on the record as a whole supporting the factual findings of the Board, we are not at liberty (as the dissent suggests at page —— of 175 U.S.App.D.C., at page 1160 of 533 F.2d) to remand the case for what it speculates might be different findings.[53] The decision of the Board is therefore

*Affirmed.*

LEVENTHAL, Circuit Judge (dissenting):

In my opinion the Board's order here cannot be affirmed, because it rests on a *per se* approach to "union signatory" subcontracting clauses that embodies legal error. The Board transforms what appears to be a local union's work preservation dispute over the subcontracting of unit work into a secondary boycott illegal under § 8(b)(4)(B) of the National Labor Relations Act, without undertaking the inquiry—mandated by the Supreme Court in *National Woodwork Manufacturers Ass'n v. NLRB*, 386 U.S. 612, 644, 87 S.Ct. 1250, 1268, 18 L.Ed.2d 357 (1967)—"into whether, under all the surrounding circumstances, the Union's objective was preservation of work for [unit] employees, or whether the agreements and boycott were tactically calculated to satisfy union objectives elsewhere."

In place of the broad factual inquiry required by *National Woodwork*, the Board uses a *per se* approach which premises that every "union signatory" subcontracting clause necessarily embodies a secondary objective, and consequently that union eco-

nomic action to enforce such a clause is automatically a violation of § 8(b)(4)(B).[1]

The Board couples its *per se* label for the clause, as making union economic enforcement illegal, with a *per se* labelling of the parties, characterizing the contracting employer as a "neutral general contractor" who is "powerless to resolve" the dispute, and dubbing the subcontractor the "primary" employer with whom the Union "had a primary dispute over the assignment of work."[2] It does this by ignoring the posture of the contractor as the one who generated the dispute by his very exercise of power, by subcontracting in violation of a concededly legal clause, and by focusing exclusively on the controversy at a point in time after the disputed subcontract had been given out. This is essentially an application of the "right to control" approach that was recently repudiated by the en banc decision of this court in *Enterprise Association v. NLRB*, 172 U.S.App.D.C. 225, 521 F.2d 885 (1975), *cert. granted*, 424 U.S. 908, 96 S.Ct. 1101, 47 L.Ed.2d 311 (1976) (No. 75–777).

Because I believe that the Board's reliance on mechanistic formulae diverted it from its duty to appraise the Union's objective in light of "the circumstances surrounding the creation of this labor dispute,"[3] I would remand for a determination consistent with *National Woodwork* and this court's rulings on "right to control."

I.

This case grows out of a multi-employer agreement negotiated by Local 644 of the Carpenters' Union (the Union), the collective bargaining agent for all union carpen-

**53.** *NLRB v. Denver Bldg. & Constr. Trades Council*, 341 U.S. 675, 691–92, 71 S.Ct. 943, 95 L.Ed. 1284 (1951). Section 10(e) of the Act also provides that on the petition to any Court of Appeals, "[t]he findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall be conclusive." 29 U.S.C. § 160(e) (1970).

**1.** Supp.App. 14.

**2.** *Id.* at 15–16.

**3.** *Enterprise Association v. NLRB*, *supra*, 521 F.2d at 897.

The Supreme Court in *National Woodwork* indicated that "such circumstances might include the remoteness of the threat of displacement by the banned product or services, the history of labor relations between the union and the employers who would be boycotted, and the economic personality of the industry." 386 U.S. at 644 n. 38, 87 S.Ct. at 1268.

ters in Tazewell and Mason Counties, Illinois, with the Home Builders Association of Tazewell County, and of a clause which restricts the subcontracting of job-site unit carpenter work except to signatories of an agreement with the International Carpenters' Union or one of its affiliates. It is common ground that the clause itself is lawful under § 8(e) of the Act, but the Board holds the Union in violation of § 8(b)(4)(B) for striking to enforce the multi-employer agreement. Although Walsh Construction Company, general contractor in charge of the erection of the superstructure of a power plant for Commonwealth Edison Company, is governed by the multi-employer agreement,[4] it subcontracted the disputed work—scaffolding over 14 feet in height and installation of power mechanisms for roll-up steel doors—to Kinnear Corporation. Kinnear, not a signatory to an agreement with the Carpenters, sought to perform the disputed tasks with members of the Ironworkers' Union, and Local 644 struck in support of its claim that this was carpenters' work, which it had lawfully sought to preserve for carpenters serving the site. Its members—carpenters employed on the Edison site by Walsh and the other charging parties, all governed by the multi-employer agreement—refused to cross the picket lines. The dispute ended when representatives of the Carpenters and Ironworkers agreed that Walsh carpenters would perform the disputed tasks.

Seizing on the bare language of the subcontracting clause, the Administrative Law Judge declared that the Union's purpose was "not to protect the work of employees already in the bargaining unit, but to enlarge the coverage of the bargaining unit by forcing the subcontractor to accept his contractor's agreement with the Union, thereby affecting his relationship with his own employees who must join a union not of their own choosing, and with potential employees who have to use the Union's hiring hall." [5] In the ALJ's taxonomy, Kinnear was the primary employer "with whom Local 644 had a primary dispute over which union was to perform the work in dispute, and Walsh was a secondary employer, embroiled in a dispute it was powerless to resolve except by unilaterally changing the terms of its subcontract with Kinnear or by ceasing to do business with it." [6] The Board adopted these "findings" without further elaboration.

The majority votes to affirm, even though the ALJ and the Board failed to give serious consideration to, and issue findings on, the Union's contention that it was engaged in a wholly primary effort to preserve traditional carpenters' work for the carpenter employees of the multiemployer unit that embraced Walsh and the other charging parties, rather than a secondary campaign to enlist Walsh's and the others' aid in organizing Kinnear's employees.[7] Pointing to the stipulation agreed to by the Board that "[t]here is one collective bargaining unit agreement in effect throughout the entire jurisdiction of the union, and the bargaining unit consists of all the [signatory] employers," [8] and to uncontroverted testimony that the disputed work involved traditional carpenter tasks [9] and that there is no single long-term employer but rather rotation of unit carpenters among a group of signatory employers in accordance with

---

**4.** Walsh, although not a member of the Home Builders Association, is party to an agreement with the International Carpenters which incorporates by reference the terms of Local 644's agreement with the Association, including the subcontracting clause at issue. Supp.App. 9.

**5.** Supp.App. 14–15.

**6.** *Id.* at 15 (emphasis omitted).

**7.** Brief of Petitioner at 13, 26–27, 32–34.

**8.** App. 25.

**9.** Representatives of Walsh and Morrison (one of the charging parties) conceded that the disputed tasks were within the traditional jurisdiction of the Carpenters' Union. App. 42, 62; Supp.App. 10. The Union also points to agreements with the Ironworkers' Union, incorporated by reference in the collective bargaining agreements signed by Walsh and the Association, assigning the disputed work to the Carpenters, Resp.Exh. 2, App. 18; Resp.Exh. 3, App. 18.

the availability of work and the operation of its hiring hall,[10] the Union submits that its objective was to preserve the disputed work for the benefit of the unit carpenters. Contrary to the ALJ's "finding," the Union asserts that it entertained no organizational objective with respect to Kinnear's iron-workers, for no enlargement of the unit would have occurred if Kinnear had abided by the multi-employer agreement regarding this work; Kinnear would merely have had to accept referrals from the Local 644 hiring hall in performing the disputed work on this site.[11]

The majority asserts that the ALJ did not focus exclusively on the bare language of the subcontracting clause, but did in fact consider and reject the above contention of the Union, and that "[its] conclusion was made only after consideration of all the relevant facts and principles and was not reached automatically or mechanically." [12] With considerable dexterity, the majority plucks a quotation from the ALJ's "concluding findings" and relocates it in a context of material nowhere adverted to in those findings, material derived in part from the ALJ's earlier introductory recitation of background facts and in part from testimony in the transcript to which the majority imparts its own gloss. The ALJ's analysis is, of course, revealed in his reasoning, in his reference to the crucial facts, in short, in his "concluding findings." What the majority's restructuring accomplishes is to convey the impression that the ALJ engaged in a multi-faceted analysis, going beyond reliance on the supposedly proscribed character of the "union signatory" clause or on the "right to control" doctrine. Thus, the majority opinion puts it: The ALJ "also earlier cited additional acts of the Union representatives which . . . were

properly interpreted and relied upon as indicating their secondary objectives." This "critical fact finding" is "also supported by" a fragment of testimony by the Local 644 business agent showing that the Union was really concerned with bringing Kinnear's employees into the Carpenters' fold. And this testimony "is buttressed by" the facts that Walsh's agreement was with the Carpenters' International union rather than Local 644 directly, and that a representative of the International was involved in the negotiations.[13]

To understand the basis of the ALJ's determination and the scope of his inquiry, the passage quoted from the ALJ's "concluding findings" by the majority must be examined in its original context:

> However, a provision which permits an employer to subcontract out on-site construction work only to a subcontractor who will himself agree to be bound by the agreement between the contractor and the Union, is an organizational device directed against the subcontractor, designed to preclude a signatory contractor from doing business with a non-signatory subcontractor. The purpose of such a provision is not to protect the work of employees already in the bargaining unit, but to enlarge the coverage of the bargaining unit by forcing the subcontractor to accept his contractor's agreement with the Union, thereby affecting his relationship with his own employees who must join a union not of their own choosing, and with potential employees who would have to use the Union's hiring Hall.[8]
>
> [8] See Article II, Sections 1 and 5 of Local 644's agreement with the Association.
>
> Applying these general principles to the facts here, Albrecht and Guler *were concerned whether Kinnear, the subcon-*

---

**10.** Brief of Petitioner at 13, 25–26, 32–33; App. 43–44, 62, 85, 94.

**11.** Brief of Petitioner at 13 ("had Walsh not subcontracted or subcontracted in accordance with the collective bargaining agreement, the same employees in the bargaining unit would have performed the work in question").

Local 644's agreement with the Association, adopted by Walsh, provided for union referrals

in filling job openings. Gen'l Counsel Exh. 3, App. 14–15. Walsh's agreement with the International Carpenters had a similar provision. Gen'l Counsel Exh. 2, App. 9.

**12.** Majority Op. at —— of 175 U.S.App.D.C., at 1153 of 533 F.2d.

**13.** *Id.* at —— —— of 175 U.S.App.D.C., at 1142–1143 of 533 F.2d.

tractor, had a bargaining agreement with the Carpenters International or some constituent body of that organization. They were demanding in effect that the Carpenters' jurisdictional claims be observed by Kinnear, and that the work in dispute be assigned to Kinnear employees whom Local 644 would represent.[14]

The italicized language is merely, as the ALJ himself explicitly says at the outset of the second paragraph, an application of the general principles set forth in the first paragraph to the facts of this case. The general principle of the first paragraph sets forth his conclusions as to the *inherent* secondary character of the "union signatory" clause. There is not even a glimmer of the approach required by *National Woodwork* —that whether the clause operates in a secondary manner cannot be foredained from the clause itself, but must be determined from the facts of the particular case. At no point in the ALJ's "concluding findings" are statements by Local 644 representatives discussed as independent evidence of a secondary objective. The testimony of Local 644's business agent, quoted by the majority, is not only ambiguous on its face, but it is nowhere quoted—or even

cited—in the ALJ's opinion.[15] Similarly, there is not a hint in the ALJ's decision of reliance on Local 644's supposed lack of "direct contact with Walsh" or on the participation of an International representative in the negotiations. It is abundantly clear why—the ALJ's was a *per se* analysis, defined by his conclusion that the clause at issue is an organizational device which necessarily carries a secondary objective. The majority, while purporting to eschew *per se* analysis, actually adopts the ALJ's approach and throughout its opinion similarly equates the mere presence of a "union signatory" clause with secondary activity.[16]

Had the ALJ and the Board followed the approach mandated by *National Woodwork*, the statements made by Local 644 officials could properly be considered as one of the surrounding circumstances of the case.[17] But the ALJ would then have had to give deliberative consideration to the Union's contention that its statements about preserving work "for Carpenters" must be interpreted as meaning "for carpenter employees of the multi-employer unit," because only those employees, not carpenters generally, would have performed the disputed work.[18]

14. Supp.App. 14–15 (emphasis supplied).

15. If the ALJ indeed intended to issue a finding on the independent evidence of Local 644's secondary activity, *see* note 32 *infra*, he surely did it in so indefinite a manner as to be undiscernible. This is plainly inadequate, for the reviewing court "must have before it findings which are sufficiently definite to enable it to review intelligently the decision of the agency and ascertain if the facts on which it acted afforded a reasonable basis for its decision." *Sindicato Puertorriqueno De Trabajadores v. Hodgson*, 145 U.S.App.D.C. 238, 245, 448 F.2d 1161, 1168 (1971); *see Saginaw Broadcasting Co. v. FCC*, 68 App.D.C. 282, 287–89, 96 F.2d 554, 559–61, *cert. denied*, 305 U.S. 613, 59 S.Ct. 72, 83 L.Ed. 391 (1938).

16. Thus, "union signatory" clauses "by their terms have a secondary focus" (p. —— of 175 U.S.App.D.C., p. 1146 of 533 F.2d); "the contractual provision on subcontracting [Local 644] sought to enforce had a secondary focus" (p. —— of 175 U.S.App.D.C., p. 1146 of 533 F.2d); "the breadth of the subcontracting limitations in the agreement, to which Union representatives constantly referred as stating their

objectives indicates that the demands and objectives of its strike exceeded mere work preservation" (p. —— of 175 U.S.App.D.C., p. 1146 of 533 F.2d); "the proscribed secondary objective clearly appears from the Union's efforts to enforce the requirements of the contract itself" (p. —— of 175 U.S.App.D.C., p. 1150 of 533 F.2d n. 35).

17. More problematic is the majority's proffer that there is significance, bearing on whether the union entertained a secondary objective, in the fact that Local 644 was not a direct party to an agreement with Walsh but merely a beneficiary of an agreement negotiated at the International level, which incorporated local contracts by reference, and that a representative of the International was involved in the negotiations. These are such typical aspects of construction industry labor relations that it is difficult to suppose that if the Board were to focus on them it would regard them as material evidence of a secondary taint.

18. *See* notes 23, 32 *infra*.

On the key questions, it is my view that the judicial function at this time is not confined to the findings as made, which embody an approach that I consider erroneous in law, but must be viewed in terms of findings that can be foreglimpsed as potentially emerging on a remand, following use of a sound legal approach.

In that context, the ultimate question is this. Was Local 644 acting on behalf of the unit employees—that is, the carpenters working on traditional carpenter work in Tazewell and Mason Counties on projects governed by the Local's multi-employer agreement with Home Builders Association? Or was it acting so as to reach beyond that unit and those employees, e. g., in order to gain new members for the Union, new contracts, or new work? In the Supreme Court's words, was Local 644's objective to preserve work for unit carpenters, or was the boycott "tactically calculated to satisfy union objectives elsewhere"?

While I do not have the responsibility for factfinding, it seems entirely congruent with the record before us that the facts will be discerned in this shape—that what Local 644 really wanted was for either Walsh or any subcontractor to use the employees already in the unit; that it was not acting in order to have Kinnear sign a contract which would benefit the Union, as an institution distinct from the unit employees, as to the acquisition of either new work or new dues-paying recruits. That this shape of the facts may fairly be discernible is strengthened in the case before us in that it does not appear that Kinnear has any carpenters in its work force (or even whether it does or proposes any other work in Tazewell and Mason Counties). Recruitment of Kin-

near's ironworkers into the Carpenter Union fold was palpably not an objective that could have been realistically contemplated by an experienced union like Local 644, rooted in strongly felt craft union loyalties.

I recognize that the statute speaks in terms of "an object," and that § 8(b)(4)(B) can be violated by the presence of a secondary object even though the union's principal concern is the primary one of work preservation for unit employees.[19] But the proscribed object must be a substantial one in light of the realities of the instant case, not a speculative gossamer of a possibility.[20] A substantial secondary objective may be evinced in other fact situations—e. g., where a union engages in selective enforcement of the clause, ignoring it when a subcontractor hires carpenters from a sister local,[21] or perhaps if the clause were enforced against a subcontractor with a work force of nonunion carpenters. The legality of Local 644's strike here, however, must be measured solely against the actual circumstances of this case.

Without an appraisal of the Union's objectives under the circumstances, the majority proceeds by speculation as to Union objectives derived from the mere language of "the subcontracting restrictions that the Union demanded be applied here." The majority hypothesizes three alternative objectives for the Local 644 strike, the last two deemed secondary: (1) to preserve traditional work for Local 644 members; (2) to have the work performed by a subcontractor under contract with the Carpenters' Union or any of its subordinate unions (although having no contract with Local 644); or (3) to have the work performed by a

---

**19.** *See NLRB v. Denver Building & Construction Trades Council,* 341 U.S. 675, 689, 71 S.Ct. 943, 95 L.Ed. 1284 (1951); *IBEW v. NLRB,* 341 U.S. 694, 700, 71 S.Ct. 954, 95 L.Ed. 1299 (1951); *Local 419, Carpet Layers v. NLRB,* 151 U.S.App.D.C. 338, 345 n. 13, 467 F.2d 392, 399 n. 13 (1972).

**20.** The cases cited by the majority, *see* note 19 *supra,* merely hold that even though the ultimate objective may be primary, § 8(b)(4)(B) is violated if an intermediate objective, necessary

to the attainment of the ultimate purpose, is secondary. *See NLRB v. Denver Building & Construction Trades Council, supra,* 341 U.S. at 688–89, 71 S.Ct. 943. They do not support the proposition that the legality of a work preservation boycott turns on the Board's ability to speculate on the possibility of insubstantial alternative objectives of a secondary character.

**21.** *Enterprise Association v. NLRB, supra,* 521 F.2d at 903–04 n. 44.

subcontractor who has agreed to sign a Local 644-dictated agreement.[22]

The majority's analysis is faulty because it is riveted to the bare language of the clause, an approach not permitting attention to be diverted to the factual context of this case. Objective (2) may be a theoretical possibility under the clause, as a matter of abstract logic, but there is neither evidence nor a finding that this was in fact an objective, or even that it was a meaningful possibility in this situation. It is not contended that there were subcontractors hiring carpenters from sister locals in this case, and there is not a scrap of evidence of a history of discrimination in favor of sister Carpenter locals in the enforcement of the subcontracting clauses to support a finding of a secondary taint. And objective (3) cannot be viewed as secondary under the circumstances of this case assuming the disputed work were preserved to the unit carpenters already represented by Local 644. The Union posits that this was both its objective and the reality of the underlying circumstances. Even postulating that a possible Union objective was to have Kinnear sign on with Local 644, the disputed work would have been done by carpenters already in the Unit and not by Kinnear's ironworkers as conscripts in the Carpenters' Union. The Union's contention seems forceful on its face, and remains uncontroverted under the ALJ's *per se* approach. I do not see how we can affirm the Board here in the absence of deliberative consideration culminating in findings on the Union's

contention.[23] On the present record, embodying the Board's erroneous approach, I cannot agree with the majority that "[t]he Union's strike objectives were . . . clearly not limited to preserving work for Local 644 unit members but also included the objective of changing the bargaining representative of the employees of a contractor with whom it did not have a contract." [24]

## II.

The Supreme Court has made clear that although the language of the secondary boycott and hot-cargo provisions, §§ 8(b)(4)(B) and 8(e), respectively, is sweeping, it must be read in light of the time-honored rights of employees to employ economic weaponry in the course of disputes with their immediate employer, even though the fallout from such conflicts often hits neutral third parties. As Justice Brennan put it in *National Woodwork:*

> Strongly held opposing views have invariably marked controversy over labor's use of the boycott to further its aims by involving an employer in disputes not his own. But congressional action to deal with such conduct has stopped short of proscribing identical activity having the object of pressuring the employer for agreements regulating relations between him and his own employees.

386 U.S. at 620, 87 S.Ct. at 1255. The distinction drawn by the *National Woodwork* Court as best comporting with congressional intent is between permissible pri-

---

**22.** Majority Op. at —— of 175 U.S.App.D.C., at 1147 of 533 F.2d.

**23.** At the very least, any such redirection to the case by the Board would have to take into account the significance of the separate provision requiring the use of Local 644's hiring hall in filling job openings of the contracting employer(s), *see* note 11 *supra,* and give consideration to its applicability to Kinnear in the event Kinnear as subcontractor were to sign the multi-employer agreement negotiated between Local 644 and the Association. The record as it stands does not support the majority's supposition that the hiring hall agreement may not be limited to existing employees and "would provide even greater pressure for Kinnear's

employees to join the Carpenter's Union, since they would then have to use the union hiring hall to retain their jobs" (p. —— of 175 U.S. App.D.C., p. 1144 of 533 F.2d n. 13). This is mere speculation in the absence of findings by the Board on the operation of the hiring hall provisions, particularly on the question of whether Kinnear employees could have retained the disputed work by simply signing on with the Carpenters or whether the pre-existing unit employees would have reclaimed the work that had been subcontracted to Kinnear, by reason of priority based on seniority.

**24.** Majority Op. at —— of 175 U.S.App.D.C., at 1148 of 533 F.2d.

mary activity involving incidental secondary effects (where "the agreement or its maintenance is addressed to the labor relations of the contracting employer *vis-à-vis* his own employees") and proscribed secondary activity (where "the tactical object . . . is [the boycotted] employer, or benefits to other than the boycotting employees or other employees of the primary employer"). *Id.* at 645, 87 S.Ct. at 1268. While "[t]his will not always be a simple test to apply," *id.,* its complexity is mandated by the statute and cannot be circumvented by *per se* rules.

Although "union signatory" clauses should be carefully scrutinized, because making the selection of subcontractors turn on their union status "bears only a tenuous relation to the legitimate economic concerns of the employees in the unit," [25] *per se* prohibition is impermissible under *National Woodwork.* The pertinent rule is that "the Board may not rely on 'blanket pronouncements in respect to subcontracting clauses.' " *Orange Belt District Council of Painters No. 48 v. NLRB,* 117 U.S.App.D.C. 233, 237, 328 F.2d 534, 538 (1964), *quoting Retail Clerks Union Local 770 v. NLRB,* 111 U.S.App.D.C. 246, 251, 296 F.2d 368, 373 (1962).

The nature and importance of a *National Woodwork* inquiry is emphasized by our opinion in *Local 742, United Brotherhood of Carpenters v. NLRB,* 144 U.S.App.D.C. 20, 444 F.2d 895, *cert. denied,* 404 U.S. 986, 92 S.Ct. 447, 30 L.Ed.2d 371 (1971). The Court held that the absence of a specific work preservation clause does not permit the

Board to avoid a *National Woodwork* inquiry into the "surrounding circumstances" to determine the union's objective. We stated:

> If the presence or absence of a specific work preservation agreement is to make a difference, it can only be as one of many "surrounding circumstances" used to determine what the *union's objective* was. It may be, for example, that when the union acts to enforce a specific clause, its objective more clearly relates to its labor relations with the primary employer. But the absence of such a specific clause is obviously not enough by itself to indicate a secondary objective relating to another employer. We note that the focus of *National Woodwork* is whether the union's objective was directed to the labor relations—not simply the specific contractual provisions, but the labor relations generally—of the union members' employer.

*Id.* at 28, 444 F.2d at 903 (emphasis in original). The case can be distinguished in particular, but its general thrust is instructive. It holds against the use of a *per se* approach grounded on contract clauses, and emphasizes the need for a full inquiry, in the context of the "surrounding circumstances," into the union's objectives.

Notwithstanding the language in some of the cases cited by the majority, the Board and the Intervenor expressing disapproval of "union signatory" clauses, none of these decisions can properly be read as finding the mere presence of such clauses violative of § 8(b)(4)(B) [26] in the absence of indepen-

---

**25.** *Meat and Highway Drivers v. NLRB,* 118 U.S.App.D.C. 287, 295, 335 F.2d 709, 717 (1964).

**26.** The few decisions which seem to have rested on a *per se* approach involved the legality under § 8(e) of "union signatory" clauses outside the construction industry. *See District No. 9, Int'l Ass'n of Machinists v. NLRB,* 114 U.S.App.D.C. 287, 315 F.2d 33 (1962) (preference to signatory subcontractors); *Meat and Highway Drivers v. NLRB,* 118 U.S.App.D.C. 287, 295, 335 F.2d 709, 717 (1964) (subcontracting in cases of lack of equipment to companies employing members of same local whenever possible); *NLRB v. Joint Council of Teamsters*

*No. 38,* 338 F.2d 23 (9th Cir. 1964) (subcontracting restricted to signatories of multi-employer agreement); *A. Duie Pyle v. NLRB,* 383 F.2d 772 (3d Cir. 1967), *cert. denied,* 390 U.S. 905, 88 S.Ct. 819, 19 L.Ed.2d 871 (1968) (provision requiring owner-operators and fleet-owners to join union as condition of retaining subcontracted work).

These decisions do not establish a *per se* rule for § 8(b)(4)(B) cases involving on-site construction industry settings because § 8(e), unlike § 8(b)(4)(B), does not require a finding of unlawful objective but may turn on probable secondary consequences. As this court held in *Meat and Highway Drivers v. NLRB, supra,* 118 U.S.App.D.C. at 294, 335 F.2d at 716:

dent evidence of a secondary (usually organizational) objective. While the unions in some of those cases argued that they were merely trying to preserve work for employees in the unit, this purported motivation was belied by the words or acts of the unions; agreement with the subcontractors leading to the organization of their employees would have resolved the dispute, which would have benefited the union, by expanding membership, but would not have preserved work for the benefit of preexisting unit employees.[27] In the cited cases, despite some broad language, the courts based their finding of a proscribed objective on the kind of examination of the attendant circumstances which the Board failed to undertake here.

The Board is in error in its premise that a union's enforcement of a "union signatory" clause is automatically equivalent to, and tainted by, a secondary objective.[28] That enforcement of a "union signatory" clause may be devoid of a secondary object is established by *NLRB v. Local 28, Sheet Metal Workers,* 380 F.2d 827 (2d Cir. 1967). The Second Circuit in that case held that § 8(b)(4)(B) did not bar a boycott by construction site employees, represented by New York Local 28, of air conditioning dampers manufactured by a Milwaukee plant, in order to enforce an agreement requiring the general contractor to purchase the dampers from New York manufacturers employing Local 28 members. The court found there was no evidence of a secondary objective, noting that the Milwaukee plant was organized by a sister local of the same international and the New York local had no desire to expand its jurisdiction into Milwaukee. While the particu-

Under § 8(e), what the Congress has prohibited are certain terms, and—as contrasted with § 8(b)(4)—the union's object is not an element of the unfair labor practice. To conclude that a contract term falling within the letter of § 8(e) properly falls within its prohibition, there must be either a finding that both parties understood and acquiesced in a secondary object for the term, or a finding that secondary consequences within § 8(e)'s intendment would probably flow from the clause, in view of the economic history and circumstances of the industry, the locality, and the parties.

See also *Truck Drivers Union Local No. 413 v. NLRB,* 118 U.S.App.D.C. 149, 152, 334 F.2d 539, 542, *cert. denied,* 379 U.S. 916, 85 S.Ct. 264, 13 L.Ed.2d 186 (1964); *Sheet Metal Workers Int'l Ass'n, Local Union No. 223 v. NLRB,* 162 U.S.App.D.C. 145, 150–51, 498 F.2d 687, 692–93 (1974).

In distinguishing these non-construction site cases from the instant controversy, I do not intend, as the majority implies (pp. —————— of 175 U.S.App.D.C., pp. 1145–1146 of 533 F.2d), that the mere legality of a clause under § 8(e) bars finding a § 8(b)(4)(B) violation. Rather, I concur in the position of this and other circuits that where the legality of the clause is clear under § 8(e), analysis must turn to an appraisal of the Union's objectives "under all the surrounding circumstances," and not be content with speculation into the probable consequences of the mere presence of the clause.

27. See, e. g., *Local No. 636, United Ass'n v. NLRB,* 108 U.S.App.D.C. 24, 30, 278 F.2d 858, 864 (1960) (testimony by union that it was concerned with general contractor's acceptance of bids with manufacturers not under contract

with union); *Retail Clerks Union Local 770 v. NLRB,* 111 U.S.App.D.C. 246, 248, 296 F.2d 368, 370 (1961), *on remand,* 145 N.L.R.B. 307 (1963) (union made clear that its demands would have been satisfied if rack-jobbers' employees merely signed up with union); *Bakery Wagon Drivers and Salesmen, Local Union No. 484 v. NLRB,* 116 U.S.App.D.C. 87, 89, 92, 321 F.2d 353, 355, 358 (1963) (substantial evidence of current dispute between union and subcontractor over union affiliation and work assignments); *Orange Belt District Council v. NLRB,* 117 U.S.App.D.C. 233, 238, 328 F.2d 534, 539 (1964) (union conceded union signatory character of subcontracting clause and its unenforceability through economic means); *Building and Construction Trades Council v. NLRB,* 117 U.S. App.D.C. 239, 240, 328 F.2d 540, 541 (1964) (union conceded that clause it sought to enforce required the contractor to use subcontractors who were willing to sign the agreements of the various local unions).

The cases cited from other circuits are to the same effect. See, e. g., *NLRB v. Construction & General Laborers' Union, Local 270,* 398 F.2d 86, 87–88 (9th Cir. 1968) (clear evidence union was concerned with non-union status of subcontractor); *NLRB v. Local 445,* 473 F.2d 249, 252 (2d Cir. 1973) (union not having contract with general contractor insisted on particular unionized subcontractor).

28. *Compare* Note, *A Rational Approach to Secondary Boycotts and Work Preservation,* 57 Va.L.Rev. 1280, 1290, 1293, 1298 (1971), *with* Lesnick, *Job Security and Secondary Boycotts: The Reach of NLRA §§ 8(b)(4) and 8(e),* 113 U.Pa.L.Rev. 1000, 1035 (1965).

lar factor stressed by the court—the absence of anti-rival union animus—is not present here,[29] Local 644 can emphatically make the same core argument, that it plainly lacked any organizational interest in Kinnear's ironworkers. In fact, Local 644's work preservation claim is more directly related to the interests of the boycotting employees than was Local 28's. In *Local 28, Sheet Metal Workers,* the only interest of the boycotting construction site workers at stake in rendering aid to fellow local union members employed in manufacturing plants was that of maintaining a mutual defense front in the local, an activity of long-range value to the striking workers, but having no current impact in terms of unit work preservation.[30] In the instant case, by contrast, the concern of the striking members of the Local was immediate— to assure for themselves current work, preserving what they had traditionally performed, and prevent its escape from the unit.

At oral argument, Board Counsel argued that *Local 28, Sheet Metal Workers* no longer represents the view of the Second Circuit with respect to "union signatory" clauses, *citing NLRB v. National Maritime Union,* 486 F.2d 907 (2d Cir. 1973), *cert. denied,* 416 U.S. 970, 94 S.Ct. 1993, 40 L.Ed.2d 559 (1974). In that case, the issue was whether the clause violated § 8(e), because the clause was not saved by the proviso put in § 8(e) for on-site construction industry situations. The court found that § 8(e) was violated by a clause providing that if the contracting shipowner sold a ship to a shipper not already under contract with the signatory union it would require that the crew be provided by the union and

that the purchaser agree to abide by the terms of the vendor's collective bargaining agreement. Since the signatory union's practice was to remove all seamen from a ship once it was sold and refit the ship with seamen enjoying seniority in the union hiring hall, it argued that appropriate work unit included all seamen who in the future may be referred from the hiring hall, and that the purpose of the clause was to preserve jobs for those employees. The court rejected the argument, concluding that given the size of the proposed unit in relation to the actual work force of the ship and the absence of contact among the vast majority of workers in the supposed unit, the clause was designed to benefit the union's interests as distinct from those of the particular employees working on the ship involved.[31] Significantly, the court did not rest on the broader proposition asserted by the Board here. Rather than end its analysis with a condemnation of the clause as being of the prohibited "union signatory" variety, the court looked at "the circumstances of the arrangement" to discern the union's real motivation. After an examination of the operation of the clause in light of the particular industrial setting, it concluded, correctly, that the union was essentially seeking to preserve work for the benefit of its general membership rather than for the work force of the unit defined by the ship that was to be sold.

The Board's approach in this case deviates from that required by *National Woodwork* and is not supported by the cases. Conceivably, even following a *National Woodwork*-type inquiry, the Board on remand might discern independent evidence of a secondary objective.[32] However, Local

**29.** Brief for the NLRB at 18 n. 32; Brief for Babcock & Wilcox as Intervenor at 31.

**30.** *See* Note, Secondary Boycotts and Work Preservation, 77 Yale L.J. 1401, 1414 (1968) ("there was no suggestion that contractors and manufacturers coordinated their bargaining activity, that union personnel frequently interchanged jobs, or that a decline in the local manufacturing level would adversely affect the union members in the installation unit.").

**31.** 486 F.2d at 914. *See* ABA, Section of Labor Relations Law, The Developing Labor Law 137 (1973 Supp.) (the maritime union's "failure to protect the jobs of the specific unit employees affected was fatal").

The court also based its decision on the union's clear antirival union motivation in securing the contested clause. 486 F.2d at 913–14.

**32.** As we suggested in *Enterprise Association,* union discrimination "in its work preservation tactics on the basis of the organizational status of the manufacturer" may provide sufficient

644 is entitled to a considered assessment of its position, as to the significance of its actions "under all the surrounding circumstances," and to specific findings based on substantial evidence.

## III.

A further difficulty I have with the Board's order is its incorporation of a "right to control" approach. In a critical paragraph, the ALJ concludes:

It was Kinnear with whom Local 644 had a primary dispute over which union was to perform the work in dispute, and Walsh was a secondary employer, embroiled in a dispute which it was *powerless to resolve* except by unilaterally changing the terms of its subcontract with Kinnear or by ceasing to do business with it.[33]

Although the majority of this division of the court seeks to minimize the italicized language, suggesting that Walsh's lack of control was "at best a minor basis" and merely one of many factors relied upon by the ALJ,[34] its opinion states, with respect to union signatory clauses, that right to control "points to a significant legal conclusion concerning the use of economic action to

alter the labor relations of other parties."[35] The majority opinion, moreover, adopts much of the tenor of the above language of the ALJ. It finds Local 644's strike illegal because

[o]nce Walsh had engaged Kinnear to fabricate steel doors off-site and then to erect the requisite scaffolding and install the power mechanisms on-site, the object of the Union's strike was—as its representatives repeatedly stated—logically directed toward changing Kinnear's organizational status, or toward forcing Kinnear off the site because it would not sign an agreement.[36]

Similarly, in its concluding remarks, rejecting what is termed the Union's "fungibility" argument, the majority opinion states:

Rotation among carpenters did not involve ironworkers and cannot be deemed to have included them in Local 644's unit. Once Kinnear was awarded the task of installing seven steel doors, Walsh could not compel Kinnear to use *any* carpenters to work on the tall scaffolding and the power mechanisms, regardless of their immediate employer, without pressuring the Ironworkers' Union to accept Local 644's jurisdictional claims.[37]

secondary taint to ban an otherwise primary work preservation dispute. 521 F.2d at 903–04 n. 44.

The Board in its brief argues that Local 644's secondary objective can be discerned not only from the language of the subcontracting clause, but also from its inquiries of Kinnear to determine whether Kinnear had a contract with the Carpenters' Union (App. 48, 101–02, 108, 116–17) and the Union's framing of its claim in terms of preserving the disputed work for carpenters generally rather than for Walsh's carpenters or the other unit employees (App. 84, 107, 110–11). *See* Brief for the NLRB at 16–19. The Union argues that in context, its statements were merely shorthand references for the carpenters of Walsh and the other unit employers on the site. *See* Brief of Petitioner at 26, 33 & n. 13; Reply Brief of Petitioner at 3–4. Since the ALJ failed to issue findings on these matters, the Board cannot now offer them as post-facto justification for its order.

The majority reflects a willingness to read the belated rationalization of Board's counsel into the ALJ's opinion, to the effect that the ALJ's decision "hinged on critical evidence" of "the Union's attempt to proselytize employees

of a secondary employer. . . ." *See* Majority Op. at —— – ——, ——, —— n. 8, —— n. 35, ——, —— of 175 U.S.App.D.C., at 1142–1143, 1146–1148, n. 8, 1149 n. 35, 1150, 1153 of 533 F.2d. This is plainly improper. *See Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156, 168–69, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962); *Braniff Airways, Inc. v. CAB,* 126 U.S.App.D.C. 399, 411, 379 F.2d 453, 465 (1967); *International Bhd. of Electrical Workers v. NLRB,* 159 U.S. App.D.C. 242, 260 n. 66, 487 F.2d 1113, 1131 n. 66 (1972), *cert. denied,* 418 U.S. 904, 94 S.Ct. 3194, 41 L.Ed.2d 1152 (1974).

33. Supp.App. 15 (emphasis supplied).

34. Majority Op. at —— of 175 U.S.App.D.C., at 1152 of 533 F.2d.

35. *Id.* at —— of 175 U.S.App.D.C., at 1152 of 533 F.2d.

36. *Id.* at ——, at 1150 of 533 F.2d.

37. *Id.* at —— of 175 U.S.App.D.C., at 1155 of 533 F.2d.

This view ignores our recent decision in *Enterprise Association v. NLRB, supra.* It is the central teaching of *Enterprise Association* that the neutrality of the contracting employer is determined by looking at the position he was in before he tied his hands by subcontracting the disputed work. If the Union's action to enforce the "union signatory" subcontracting clause was in the context of a permissible work preservation effort, that could not be converted into *per se* prohibited secondary activity by the mere fact that after signing that clause Walsh had proceeded by subcontracting to Kinnear and thus became "powerless" to reassign the disputed work to its carpenter employees without acting in breach of that subcontract.[38] Walsh had the power to assign the work to its own carpenters at the

time it gave the subcontract to Kinnear, and in fact had reserved carpentry work for its own employees on previous subcontracts.[39] The dilemma Walsh brought upon itself cannot supply the determinative ground for finding Walsh to be a neutral employer embroiled in a controversy not of its own making.[40]

To the extent the Board's ruling and the majority's affirmance are motivated by solicitude for employers in Walsh's position who, having subcontracted work in violation of negotiated restrictions permissible under § 8(e), find themselves confronted by the conflicting claims of rival unions, their concern is misplaced. Walsh was not without recourse. He was confronted with a jurisdictional dispute and could have brought jurisdictional boycott charges under § 8(b)(4)(D).[41] The Board would have

---

**38.** It is not clear from the record that Walsh could not reassign the work consistent with the subcontract. *See* App. 68–69.

**39.** App. 43–44, 69, 94.

**40.** As we held in *Enterprise Association:*

We do not think that an employer who is struck by his own employees for the purpose of requiring him to do what he has lawfully contracted to do to benefit those employees can ever be considered a neutral bystander in a dispute not his own. . . . [W]here there is a valid work preservation provision in a collective bargaining agreement and where a union refuses to acquiesce in an employer's violation of that agreement, it is reasonable to assume that the employer *can* comply in accordance with his prior commitment to his workers and that, absent more evidence than mere stoppage of work, the union's objectives are legitimate . . . .

521 F.2d at 903–04.

The majority states (pp. —–— of 175 U.S.App.D.C., pp. 1150–1151 of 533 F.2d n. 36), that my dissent "attempts to read *Enterprise* as supporting the view that in all instances a *prior* agreement by a contractor limiting his choice of subcontractors to those that recognized the Carpenters' jurisdiction is a defense to a violation of section 8(b)(4)(B)." That statement of the majority is inaccurate. Rather, I find this court's position in *Enterprise* to be that the mere fact that the contracting employer tied his hands does not end our inquiry into "all the surrounding circumstances." If the boycotting union's objectives are primary—that is, if Local 644 sought to preserve work for its members, rather than to organize Kinnear's employees— the fact that the contracting employer has entered into an agreement with the subcontractor

which must be breached if the boycotting union prevails cannot be determinative for § 8(b)(4)(B) purposes.

**41.** § 8(b)(4)(D), 29 U.S.C. § 158(b)(4)(D) provides:

(b) It shall be an unfair labor practice for a labor organization or its agents—

(4)(i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is—

(D) forcing or requiring any employer to assign particular work to employees in a particular labor organization or in a particular trade, craft, or class rather than to employees in another labor organization or in another trade, craft, or class, unless such employer is failing to conform to an order or certification of the Board determining the bargaining representative for employees performing such work.

Jurisdictional disputes governed by § 8(b)(4)(D) are not limited to those between competing labor organizations representing members who are employees of the same employer. Rather, what § 8(b)(4)(D) requires is that there are two competing groups of employees claiming the work in question, and that the charged party has used proscribed means to have the work assigned to it rather than to the other group of employees. *See, e. g., Local*

been empowered under § 10(k) to assign the work to the appropriate union.[42] As the Supreme Court has recently emphasized, this procedure was developed by Congress "[i]n the belief that resolution of jurisdictional disputes was more important to industrial peace than the imposition of unfair labor practice sanctions," and § 10(k) was developed as a procedure that would have strong practical consequences but, being only advisory in legal effect, could be carried out expeditiously, without the restrictions governing adjudications. *ITT v. Local 134, Int'l Bhd. of Electrical Workers,* 419 U.S. 428, 430–31, 447–48, 95 S.Ct. 600, 603, 42 L.Ed.2d 558 (1975). Walsh was not required to invoke a remedy under § 8(b)(4)(D) if there was a violation of § 8(b)(4)(B).[43] But the availability of relief under § 8(b)(4)(D) underscores the importance of a deliberative approach to § 8(b)(4)(B), without ascribing secondary objectives to work preservation disputes by means of *per se* categorization of "union signatory" clauses and reliance on "right to control."

I respectfully dissent.

---

*134, Int'l Bhd. of Electrical Workers v. NLRB,* 486 F.2d 863, 866 (7th Cir. 1973), *aff'd on this point but rev'd on other grounds, ITT v. Local 134, Int'l. Bhd. of Electrical Workers,* 419 U.S. 428, 436, 95 S.Ct. 600, 42 L.Ed.2d 558 (1975); *Sheet Metal Workers Local Union No. 54 (Goodyear Tire & Rubber Co.),* 203 NLRB 74 (1973). *See Generally* ABA, Section of Labor Relations Law, The Developing Labor Law 680 (1971).

**42.** § 10(k), 29 U.S.C. § 160(k) provides:

(k) Whenever it is charged that any person has engaged in an unfair labor practice within the meaning of paragraph (4)(D) of section 158(b) of this title, the Board is empowered and directed to hear and determine the dispute out of which such unfair labor practice shall have arisen, unless, within ten days after notice that such charge has been filed, the parties to such dispute submit to the Board satisfactory evidence that they have adjusted, or agreed upon methods for the voluntary adjustment of, the dispute. Upon compliance by the parties to the dispute with the decision of the Board or upon such voluntary adjustment of the dispute, such charge shall be dismissed.

**43.** Sections 8(b)(4)(B) and 8(b)(4)(D) are not mutually exclusive provisions, and some disputes may properly fall under the ban of both. *See NLRB v. Local 825, Operating Engineers,* 400 U.S. 297, 305–06, 91 S.Ct. 402, 27 L.Ed.2d 398 (1971); *Local 5, Plumbers v. NLRB,* 116 U.S.App.D.C. 100, 105, 321 F.2d 366, 371, *cert. denied,* 375 U.S. 921, 84 S.Ct. 266, 11 L.Ed.2d 165 (1963).